# OKLAHOMA TAX COMMISSION *v.* CHICKASAW NATION

No. 94–771.   Argued April 24, 1995—Decided June 14, 1995

GINSBURG, J., delivered the opinion for a unanimous Court with respect to Parts I and II, and the opinion of the Court with respect to Part III, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, O'CONNOR, and SOUTER, JJ., joined, *post*, p. 468.

*Charles Rothfeld* argued the cause for petitioner. With him on the briefs were *Gary A. Winters, Stanley Johnston,* and *David Allen Miley.*

*Dennis W. Arrow* argued the cause for respondent. With him on the briefs was *Bob Rabon.*

*Paul A. Engelmayer* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Assistant Attorney General Schiffer,* and *Deputy Solicitor General Kneedler.**

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the taxing authority of the State of Oklahoma over the Chickasaw Nation (Tribe) and its members.[1] We take up two questions: (1) May Oklahoma impose

---

*Briefs of *amici curiae* urging reversal were filed for the State of South Dakota et al. by *Mark W. Barnett,* Attorney General of South Dakota, and *Lawrence E. Long,* Chief Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Daniel E. Lungren* of California, *Richard P. Ieyoub* of Louisiana, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Heidi Heitkamp* of North Dakota, *Theodore R. Kulongoski* of Oregon, *Jan Graham* of Utah, *James E. Doyle* of Wisconsin, and *Joseph B. Meyer* of Wyoming; and for the Petroleum Marketers Association of America et al. by *Robert S. Bassman* and *Alphonse M. Alfano.*

Briefs of *amici curiae* urging affirmance were filed for the Cherokee Nation by *David A. Mullon, Jr.,* and *L. Susan Work;* for the Cheyenne-Arapaho Tribes of Oklahoma et al. by *Kim Jerome Gottschalk, Rodney B. Lewis, Bertram Hirsch, Doug Nash, Carol Barbero, Patrice Kunesh,* and *Christopher D. Quale;* for the Choctaw Nation by *Glenn M. Feldman;* for the Navajo Nation Oil and Gas Co., Inc., by *Paul E. Frye* and *Wayne H. Bladh;* and for the Sac and Fox Nation by *G. William Rice* and *Gregory H. Bigler.*

[1] For the Court's most recent encounters with questions of state authority to tax Indian Tribes and their members, and tribal immunity from state taxation, see *Department of Taxation and Finance of N. Y.* v. *Milhelm Attea & Bros.,* 512 U. S. 61 (1994); *Oklahoma Tax Comm'n* v. *Sac and Fox Nation,* 508 U. S. 114 (1993); *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation,* 502 U. S. 251 (1992); *Oklahoma Tax*

its motor fuels excise tax upon fuel sold by Chickasaw Nation retail stores on tribal trust land; (2) May Oklahoma impose its income tax upon members of the Chickasaw Nation who are employed by the Tribe but who reside in the State outside Indian country.[2]

We hold that Oklahoma may not apply its motor fuels tax, as currently designed, to fuel sold by the Tribe in Indian country. In so holding, we adhere to settled law: when Congress does not instruct otherwise, a State's excise tax is unenforceable if its legal incidence falls on a Tribe or its members for sales made within Indian country. We further hold, however, that Oklahoma may tax the income (including wages from tribal employment) of all persons, Indian and non-Indian alike, residing in the State outside Indian country. The Treaty between the United States and the Tribe, which guarantees the Tribe and its members that "no Territory or State shall ever have a right to pass laws for the government of" the Chickasaw Nation, does not displace the rule, accepted interstate and internationally, that a sovereign may tax the entire income of its residents.

## I

The Chickasaw Nation, a federally recognized Indian Tribe, commenced this civil action in the United States District Court for the Eastern District of Oklahoma, to stop the State of Oklahoma from enforcing several state taxes against the Tribe and its members.[3] Pertinent here, the District

---

*Comm'n* v. *Citizen Band of Potawatomi Tribe of Okla.*, 498 U. S. 505 (1991).

[2] "Indian country," as Congress comprehends that term, see 18 U. S. C. § 1151, includes "formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States." *Sac and Fox*, 508 U. S., at 123.

[3] In addition to the motor fuels and income taxes before us, the Tribe's complaint challenged motor vehicle excise taxes on Tribe-owned vehicles, retail sales taxes on certain purchases by the Tribe for its own use, and

Court, ruling on cross-motions for summary judgment, held for the State on the motor fuels tax imposition and largely for the Tribe on the income tax issue. The Court of Appeals for the Tenth Circuit ruled for the Tribe and its members on both issues: It held that the State may not apply the motor fuels tax to fuel sold by the Tribe's retail stores, and, further, that the State may not tax the wages of members of the Chickasaw Nation who work for the Tribe, even if they reside outside Indian country. 31 F. 3d 964 (1994).

Concerning the motor fuels tax, the Tenth Circuit disapproved the District Court's "balancing of the respective tribal and state interests" approach. *Id.*, at 972. The legal incidence of the tax, the Court of Appeals ruled, is the key concept. That incidence, the Tenth Circuit determined, falls directly on fuel retailers—here, on the Tribe, due to its operation of two convenience stores that sell fuel to tribal members and other persons. Oklahoma's imposition of its fuels tax on the Tribe as retailer, the Court of Appeals concluded, "conflicts with . . . the traditional scope of Indian sovereign authority." *Ibid.* Because the State asserted no congressional authorization for its exaction, the Tenth Circuit declared the fuels tax preempted.

Oklahoma's income tax, in the Court of Appeals' view, could not be applied to *any* tribal member employed by the Tribe;[4] residence, the Tenth Circuit said, was "simply not relevant to [its] determination." *Id.*, at 979. The Court of Appeals relied on the provision of the Treaty of Dancing

---

sales taxes on 3.2% beer sold at the Tribe's two convenience stores, as well as tax warrants issued against officers of the Tribe. In the course of litigation, Oklahoma apparently decided not to contest the Tribe's claims regarding the vehicle and retail sales taxes, and withdrew the warrants; the United States Court of Appeals for the Tenth Circuit affirmed the District Court's grant of summary judgment for the State on the 3.2% beer tax, and the Tribe has not sought our review of that issue.

[4] In a ruling not before us, see Brief for Respondent 47, the Court of Appeals upheld application of Oklahoma's income tax to Chickasaw Nation employees who are not members of the Tribe.

Rabbit Creek, Sept. 27, 1830, Art. IV, 7 Stat. 333–334, that "no Territory or State shall ever have a right to pass laws for the government of the [Chickasaw] Nation of Red People and their descendants." To this treaty language, the Tenth Circuit applied "the general rule that '[d]oubtful expressions are to be resolved in favor of' the Indians." 31 F. 3d, at 978 (quoting *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 174 (1973)). The Court of Appeals also noted that it had endeavored to "rea[d] the treaty as the Indians [who signed it] would have understood it." 31 F. 3d, at 979.

We granted the State's petition for certiorari, 513 U. S. 1071 (1995), and now (1) affirm the Court of Appeals' judgment as to the motor fuels tax, and (2) reverse that judgment as to the income tax applied to earnings of tribal members who work for the Tribe but reside in the State outside Indian country.

## II

The Tribe contends, and the Tenth Circuit held, that Oklahoma's fuels tax[5] is levied on retailers, not on distributors or consumers. The respect due to the Chickasaw Nation's sovereignty, the Tribe maintains, means Oklahoma—absent congressional permission—may not collect its tax for fuel supplied to, and sold by, the Tribe at its convenience stores. In support of the tax immunity it asserts, the Tribe recalls our reaffirmations to this effect: "The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes . . . , and in recognition of the sovereignty retained by Indian tribes even after formation of the United States, Indian tribes and individuals generally are exempt from state taxation within their own territory." *Montana* v. *Blackfeet Tribe*, 471 U. S. 759, 764 (1985); see

---

[5] According to the State's Tax Commission, Oklahoma imposes fuels tax at the rate of 17 cents per gallon for gasoline and 14 cents per gallon for diesel fuel. Brief for Petitioner 2–3; see Okla. Stat., Tit. 68, §§ 502, 502.2, 502.4, 502.6, 516, 520, 522 (1991) (gasoline); §§ 502.1, 502.3, 502.5, 502.7, 522.1 (diesel fuel).

also, *e. g., Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148 (1973).

In response, Oklahoma urges that Indian tribes and their members are not inevitably, but only "'generally,'" immune from state taxation. Brief for Petitioner 19 (quoting *Blackfeet Tribe,* 471 U. S., at 764). At least as to some aspects of state taxation, Oklahoma asserts, an approach "balancing the state and tribal interests" is in order. Brief for Petitioner 17. Even if the legal incidence of the fuels tax falls on the Tribe (as retailer), Oklahoma concludes, tax immunity should be disallowed here because "the state interest supporting the levy is *compelling,* . . . the tribal interest is *insubstantial,* and . . . the state tax would have no effect on 'tribal governance and self-determination.'" *Id.,* at 22 (emphasis in original).

In the alternative, Oklahoma argues that the Court of Appeals "erred in holding that the legal incidence of the fuel tax falls on the retailer." *Id.,* at 10. Moreover, the State newly contends, even if the fuels tax otherwise would be impermissible, Congress, in the 1936 Hayden-Cartwright Act, 4 U. S. C. § 104, expressly permitted state taxation of reservation activity of this type. Brief for Petitioner 23–24.

We set out first our reason for refusing to entertain at this late date Oklahoma's argument that the Hayden-Cartwright Act expressly permits state levies on motor fuels sold on Indian reservations. We then explain why we agree with the Tenth Circuit on the Tribe's exemption from Oklahoma's fuels tax.

A

On brief, the State points out—for the first time in this litigation—that the Hayden-Cartwright Act, 4 U. S. C. § 104, expressly authorizes States to tax motor fuel sales on "United States military or other reservations." § 104(a). The Act's word "reservations," Oklahoma maintains, encompasses Indian reservations. Brief for Petitioner 23–24. We decline to address this question of statutory interpretation.

The State made no reference to the Hayden-Cartwright Act in the courts of first and second instance. And even though the Court of Appeals flagged the Act's possible relevance,[6] Oklahoma did not mention this 1936 legislation in its petition for certiorari. Nor is Oklahoma's newly discovered claim of vintage legislative authorization "fairly included"[7] in the question the State tendered for our review: "Whether principles of federal pre-emption or Indian sovereignty preclude a State from imposing a tax on motor fuel sold by an Indian tribe . . . . ?" Pet. for Cert. (i). As a court of review, not one of first view, we will entertain issues withheld until merits briefing "'only in the most exceptional cases.'" *Yee* v. *Escondido*, 503 U. S. 519, 535 (1992) (citation omitted). This case does not fit that bill.

B

Assuming, then, that Congress has not expressly authorized the imposition of Oklahoma's fuels tax on fuel sold by the Tribe, we must decide if the State's exaction is nonetheless permitted. Oklahoma asks us to make the determination by weighing the relevant state and tribal interests, and urges that the balance tilts in its favor. Oklahoma emphasizes that the fuel sold is used "almost exclusively on state roads," imposing "very substantial costs on the State—but no burden at all on the Tribe." Brief for Petitioner 9. The State

---

[6] The Court of Appeals noted:

"In *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 151, n. 16 . . . (1980), the Supreme Court declined to reach the question whether Indian reservations might be encompassed by the Hayden-Cartwright Act, 4 U. S. C. § 104, which provides for the imposition of state fuel taxes 'on United States military or other reservations.' This issue was not raised before this court, and we express no opinion on it." 31 F. 3d 964, 972, n. 4 (1994).

[7] This Court's Rule 14.1(a); see *Yee* v. *Escondido*, 503 U. S. 519, 533 (1992). Cf. *Lebron* v. *National Railroad Passenger Corporation*, 513 U. S. 374, 379–380 (1995) (reaching issue addressed in decision under review and "fairly embraced within" both the question set forth in the petition for certiorari and the argument advanced in the petition).

also stresses that "the levy does not reach any value generated by the Tribe on Indian land," *id.*, at 10; *i. e.*, the fuel is not produced or refined in Indian country, and is often sold to outsiders.

We have balanced federal, state, and tribal interests in diverse contexts, notably, in assessing state regulation that does not involve taxation, see, *e. g.*, *California* v. *Cabazon Band of Mission Indians*, 480 U. S. 202, 216–217 (1987) (balancing interests affected by State's attempt to regulate on-reservation high-stakes bingo operation), and state attempts to compel Indians to collect and remit taxes actually imposed on non-Indians, see, *e. g.*, *Moe* v. *Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U. S. 463, 483 (1976) (balancing interests affected by State's attempt to require tribal sellers to collect cigarette tax on non-Indians; precedent about state taxation of Indians is not controlling because "this [collection] burden is not, strictly speaking, a tax at all").

But when a State attempts to levy a tax directly on an Indian tribe or its members inside Indian country, rather than on non-Indians, we have employed, instead of a balancing inquiry, "a more categorical approach: '[A]bsent cession of jurisdiction or other federal statutes permitting it,' we have held, a State is without power to tax reservation lands and reservation Indians." *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 258 (1992) (citation omitted). Taking this categorical approach, we have held unenforceable a number of state taxes whose legal incidence rested on a tribe or on tribal members inside Indian country. See, *e. g.*, *Bryan* v. *Itasca County*, 426 U. S. 373 (1976) (tax on Indian-owned personal property situated in Indian country); *McClanahan*, 411 U. S., at 165–166 (tax on income earned on reservation by tribal members residing on reservation).

The initial and frequently dispositive question in Indian tax cases, therefore, is who bears the legal incidence of a tax.

If the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization. See, *e. g., Moe,* 425 U. S., at 475–481 (Montana's cigarette sales tax imposed on retail consumers could not be applied to on-reservation "smoke shop" sales to tribal members). But if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax; if the balance of federal, state, and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy, see *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134, 154–157 (1980), and may place on a tribe or tribal members "minimal burdens" in collecting the toll, *Department of Taxation and Finance of N. Y.* v. *Milhelm Attea & Bros.,* 512 U. S. 61, 73 (1994). Thus, the inquiry proper here is whether the legal incidence of Oklahoma's fuels tax rests on the Tribe (as retailer), or on some other transactors—here, the wholesalers who sell to the Tribe or the consumers who buy from the Tribe.[8]

Judicial focus on legal incidence in lieu of a more venturesome approach accords due deference to the lead role of Congress in evaluating state taxation as it bears on Indian tribes and tribal members. See *Yakima,* 502 U. S., at 267. The State complains, however, that the legal incidence of a tax " 'has no relationship to economic realities.' " Brief for Petitioner 30 (quoting *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 279 (1977)). But our focus on a tax's legal incidence accommodates the reality that tax administration

---

[8] In weighing the affected interests without determining the legal incidence of the fuels tax, the District Court apparently confused our cases about state taxation of non-Indians with those about state taxation of Indians. The court cited a case of the former type, *Washington* v. *Confederated Tribes of Colville Reservation,* 447 U. S. 134 (1980). See App. to Pet. for Cert. 36a. But in *Colville* we resorted to balancing only after determining that the legal incidence of the challenged levy was on non-Indian consumers. 447 U. S., at 142, n. 9.

requires predictability. The factors that would enter into an inquiry of the kind the State urges are daunting. If we were to make "economic reality" our guide, we might be obliged to consider, for example, how completely retailers can pass along tax increases without sacrificing sales volume—a complicated matter dependent on the characteristics of the market for the relevant product. Cf. *Yakima*, 502 U. S., at 267–268 (categorical approach safeguards against risk of litigation that could "engulf the States' annual assessment and taxation process, with the validity of each levy dependent upon a multiplicity of factors that vary from year to year, and from parcel to parcel").

By contrast, a "legal incidence" test, as 11 States with large Indian populations have informed us, "provide[s] a reasonably bright-line standard which, from a tax administration perspective, responds to the need for substantial certainty as to the permissible scope of state taxation authority." Brief for South Dakota et al. as *Amici Curiae* 2.[9] And if a State is unable to enforce a tax because the legal incidence of the impost is on Indians or Indian tribes, the State generally is free to amend its law to shift the tax's legal incidence. So, in this case, the State recognizes and the Tribe agrees that Oklahoma could accomplish what it here seeks "by declaring the tax to fall on the consumer and directing the Tribe to collect and remit the levy." Pet. for Cert. 17; see Brief for Respondent 10–13.[10]

---

[9] Support for focusing on legal incidence is also indicated in cases arising in the analogous context of the Federal Government's immunity from state taxation. See *United States* v. *County of Fresno*, 429 U. S. 452, 459 (1977) ("States may not . . . impose taxes the legal incidence of which falls on the Federal Government.").

[10] A measure designed to do just that, Committee Substitute for H. B. 1522, 45th Okla. Leg., 1st Sess. (1995), was approved by the Oklahoma House of Representatives on March 9, 1995, but failed to gain passage in the Oklahoma Senate during the legislature's 1995 session. See Brief for Respondent 11, 1a–23a; Supplemental Brief for Respondent 1.

## C

The State also argues that, even if legal incidence is key, the Tenth Circuit erred in holding that the fuels tax's legal incidence rests on the retailer (here, the Tribe). We consider the Court of Appeals' ruling on this point altogether reasonable, and therefore uphold it. See, *e. g.*, *Haring* v. *Prosise*, 462 U. S. 306, 314, n. 8 (1983) (noting "our practice to accept a reasonable construction of state law by the court of appeals").

The Oklahoma legislation does not expressly identify who bears the tax's legal incidence—distributors, retailers, or consumers; nor does it contain a "pass through" provision, requiring distributors and retailers to pass on the tax's cost to consumers. Cf. *Moe*, 425 U. S., at 482 (statute at issue provided that Montana cigarette tax "'shall be conclusively presumed to be [a] direct [tax] on the retail consumer precollected for the purpose of convenience and facility only'").

In the absence of such dispositive language, the question is one of "fair interpretation of the taxing statute as written and applied." *California Bd. of Equalization* v. *Chemehuevi Tribe*, 474 U. S. 9, 11 (1985) *(per curiam)*. Oklahoma's law requires fuel distributors to "remit" the amount of tax due to the Tax Commission; crucially, the statute describes this remittal by the distributor as *"on behalf of a licensed retailer."* Okla. Stat., Tit. 68, § 505(C) (1991) (emphasis added). The inference that the tax obligation is legally the retailer's, not the distributor's, is supported by the prescriptions that sales between distributors are exempt from taxation, § 507, but sales from a distributor to a retailer are subject to taxation, § 505(E). Further, if the distributor remits taxes it subsequently is unable to collect from the retailer, the distributor may deduct the uncollected amount from its future payments to the Tax Commission. § 505(C). The distributor, then, "is no more than a transmittal agent

for the taxes imposed on the retailer." 31 F. 3d, at 971. And for their services as "agent of the state for [tax] collection," distributors retain a small portion of the taxes they collect. § 506(a).

The fuels tax law contains no comparable indication that retailers are simply collection agents for taxes ultimately imposed on consumers. No provision sets off the retailer's liability when consumers fail to make payments due; neither are retailers compensated for their tax collection efforts. And the tax imposed when a distributor sells fuel to a retailer applies whether or not the fuel is ever purchased by a consumer. See, e. g., § 502 ("There is hereby levied an excise tax . . . upon the sale of each and every gallon of gasoline sold, or stored and distributed, or withdrawn from storage . . . ."). Finally, Oklahoma's law imposes no liability of any kind on a consumer for purchasing, possessing, or using untaxed fuel; in contrast, the legislation makes it unlawful for distributors or retailers "to sell or offer for sale in this state, motor fuel or diesel fuel while delinquent in the payment of any excise tax due the state." § 505(C).

As the Court of Appeals fairly and reasonably concluded: "[T]he import of the language and the structure of the fuel tax statutes is that the distributor collects the tax from the retail purchaser of the fuel"; the "motor fuel taxes are legally imposed on the retailer rather than on the distributor or the consumer." 31 F. 3d, at 971–972.

### III

Regarding Oklahoma's income tax, the Court of Appeals declared that the State may not tax the wages of members of the Chickasaw Nation who work for the Tribe, including members who reside in Oklahoma outside Indian country.

The holding on tribal members who live in the State outside Indian country runs up against a well-established principle of interstate and international taxation—namely, that a jurisdiction, such as Oklahoma, may tax *all* the income

of its residents, even income earned outside the taxing jurisdiction:[11]

> "That the receipt of income by a resident of the territory of a taxing sovereignty is a taxable event is universally recognized. Domicil itself affords a basis for such taxation. Enjoyment of the privileges of residence in the state and the attendant right to invoke the protection of its laws are inseparable from responsibility for sharing the costs of government . . . . These are rights and privileges which attach to domicil within the state. . . . Neither the privilege nor the burden is affected by the character of the source from which the income is derived." *New York ex rel. Cohn* v. *Graves*, 300 U. S. 308, 312–313 (1937).

This "general principl[e] . . . ha[s] international acceptance." American Law Institute, Federal Income Tax Project: International Aspects of United States Income Taxation 4, 6 (1987); see, *e. g.*, C. Cretton, Expatriate Tax Manual 1 (2d ed. 1991) ("An individual who is resident in the UK is subject to income tax on all his sources of income, worldwide."). It has been applied both to the States, *e. g.*, *Shaffer* v. *Carter*, 252 U. S. 37, 57 (1920); see 2 J. Hellerstein & W. Hellerstein, State Taxation § 20.04, p. 20–13 (1992), and to the Federal Government, *e. g.*, *Cook* v. *Tait*, 265 U. S. 47, 56 (1924); see 1 J. Isenbergh, International Taxation 45–56 (1990).[12]

---

[11] For nonresidents, in contrast, jurisdictions generally may tax only income earned within the jurisdiction. See *Shaffer* v. *Carter*, 252 U. S. 37, 57 (1920) (as to residents, a State "may, and does, exert its taxing power over their income from all sources"; as to nonresidents, "the tax is only on such income as is derived from . . . sources [within the State]").

[12] Although sovereigns have authority to tax all income of their residents, including income earned outside their borders, they sometimes elect not to do so, and they commonly credit income taxes paid to other sovereigns. But "[i]f foreign income of a domiciliary taxpayer is exempted, this is an independent policy decision and not one compelled by jurisdictional considerations." American Law Institute, Federal Income

The Tribe seeks to block the State from exercising its ordinary prerogative to tax the income of every resident; in particular, the Tribe seeks to shelter from state taxation the income of tribal members who live in Oklahoma outside Indian country but work for the Tribe on tribal lands.[13]  For the exception the Tribe would carve out of the State's taxing authority, the Tribe gains no support from the rule that Indians and Indian tribes are generally immune from state taxation, *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164 (1973), as this principle does not operate outside Indian country.  *Oklahoma Tax Comm'n* v. *Sac and Fox Nation*, 508 U. S. 114, 123–126 (1993).

Notably, the Tribe has not asserted here, or before the Court of Appeals, that the State's tax infringes on tribal self-governance.  See Brief in Opposition 9–10 ("infringement" question is not presented to this Court); Brief for Respondent 42, n. 37; see also *Sac and Fox*, 508 U. S., at 126 (reserving question "whether the Tribe's right to self-governance could operate independently of its territorial jurisdiction to pre-empt the State's ability to tax income

Tax Project: International Aspects of United States Income Taxation 6 (1987).

Concerning salaries of United States resident "diplomats and employees of international organizations," *post*, at 470, the dissent speaks of "treaties" as the wellsprings of "an *exception*" to otherwise governing tax law. That is not quite right.  It is dominantly United States internal law that sets the ground rules for exemptions accorded employees of foreign governments and international organizations.   In return for exemption of foreign government employees from United States federal taxation, § 893 of the Internal Revenue Code requires that the employer government grant equivalent exemption to United States Government employees performing similar services abroad.  26 U. S. C. § 893(a)(3); see *Toll* v. *Moreno*, 458 U. S. 1, 15–16 (1982) (identifying statutory genesis of § 893 exemption); 1 J. Isenbergh, International Taxation 393–394 (1990).

[13] The Tribe's claim, as presented in this case, is a narrow one.  The Tribe does not assert here its authority to tax the income of these tribal members.  Nor does it complain that Oklahoma fails to award a credit against state taxes for taxes paid to the Tribe.

earned from work performed for the Tribe itself when the employee does not reside in Indian country").[14]

Instead, the Tribe relies on the argument that Oklahoma's levy impairs rights granted or reserved by federal law. See *Mescalero Apache Tribe* v. *Jones*, 411 U. S., at 148–149 ("[E]xpress federal law to the contrary" overrides the general rule that "Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State."). The Tribe invokes the Treaty of Dancing Rabbit Creek, Sept. 27, 1830, Art. IV, 7 Stat. 333–334, which provides in pertinent part:

> "The Government and people of the United States are hereby obliged to secure to the said [Chickasaw[15]] Nation of Red People the jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the [Chickasaw] Nation of Red People and their descendants . . . but the U. S. shall forever secure said [Chickasaw] Nation from, and against, all [such] laws . . . ."

According to the Tribe, the State's income tax, when imposed on tribal members employed by the Tribe, is a law "for the government of the [Chickasaw] Nation of Red People and their descendants," and it is immaterial that these "descendants" live outside Indian country.

In evaluating this argument, we are mindful that "treaties should be construed liberally in favor of the Indians."

---

[14] The United States suggests, as a potential disposition, that we remand on the "self-governance" question. Brief for United States as *Amicus Curiae* 30, n. 18. But an interference-with-self-governance plea was neither made in the lower courts nor presented here, and is therefore foreclosed in this case.

[15] This treaty, first concluded between the United States and the Choctaw Nation in 1830, became applicable to the Chickasaw Nation in 1837. See Treaty of Jan. 17, 1837, Art. I, 11 Stat. 573.

*County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226, 247 (1985). But liberal construction cannot save the Tribe's claim, which founders on a clear geographic limit in the Treaty. By its terms, the Treaty applies only to persons and property "within [the Nation's] limits." We comprehend this Treaty language to provide for the Tribe's sovereignty within Indian country. We do not read the Treaty as conferring super-sovereign authority to interfere with another jurisdiction's sovereign right to tax income, from all sources, of those who choose to live within that jurisdiction's limits.

The Tribe and the United States [16] further urge us to read the Treaty in accord with the repudiated view that an income tax imposed on government employees should be treated as a tax on the government. See *Dobbins* v. *Commissioners of Erie Cty.*, 16 Pet. 435 (1842). But see *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466, 480 (1939) ("The theory, which once won a qualified approval, that a tax on income is legally or economically a tax on its source, is no longer tenable . . . ."). Under this view, a tax on tribal members employed by the Tribe would be seen as an impermissible tax on the Tribe itself.

We doubt the signatories meant to incorporate this now-defunct view into the Treaty. They likely gave no thought to a State's authority to tax the income of tribal members

---

[16] In its alliance with the Tribe, the United States is not an entirely disinterested party. The United States affords Chickasaw tribal member employees no exemption from *federal* income tax. See *Squire* v. *Capoeman*, 351 U. S. 1, 6 (1956) ("[I]n ordinary affairs of life, not governed by treaties or remedial legislation, [Indians] are subject to the payment of income taxes as are other citizens."); *Hoptowit* v. *Commissioner*, 709 F. 2d 564 (CA9 1983) (rejecting claim of federal tax exemption for income from tribal employment); *Jourdain* v. *Commissioner*, 617 F. 2d 507 (CA8) *(per curiam)* (same), cert. denied, 449 U. S. 839 (1980). And, in computing employees' federal income tax base, state income tax is allowed as an itemized deduction. 26 U. S. C. § 164(a)(3). Thus, an exemption of wages from *state* income tax increases federal income tax revenue.

living in the State's domain, because they did not expect any members to be there. On the contrary, the purpose of the Treaty was to put distance between the Tribe and the States. Under the Treaty, the Tribe moved across the Mississippi River, from its traditional lands within Mississippi and Alabama, to unsettled lands not then within a State. See D. Hale & A. Gibson, The Chickasaw 46–59 (1991).

Moreover, importing the *Dobbins* rule into the Treaty would prove too much. That dubious doctrine, by typing taxation of wages earned by tribal employees as taxation of the Tribe itself, would require an exemption for *all* employees of the Tribe—not just tribal members, but nonmembers as well. The Court of Appeals rejected such an extension, see 31 F. 3d, at 975 ("It is settled that the income tax is imposed on the employee, not the employer .... Therefore, to the extent that the income tax is imposed on non-member employees who have no established claim to tribal ancestry, the tax does not infringe upon the treaty prohibition."), and even the Tribe is not urging this view before us, admitting that it is "substantially more tenuous." Brief for Respondent 47.

\*　　\*　　\*

For the reasons stated, we affirm the judgment of the Court of Appeals as to the motor fuels tax, reverse that judgment as to the income tax, and remand the case for proceedings consistent with this opinion.

*It is so ordered.*

### APPENDIX TO OPINION OF THE COURT

Treaty of Dancing Rabbit Creek,
Sept. 27, 1830, Article IV,
7 Stat. 333–334

The Government and people of the United States are hereby obliged to secure to the said [Chickasaw] Nation of Red People the jurisdiction and government of all the persons and

property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the [Chickasaw] Nation of Red People and their descendants; and that no part of the land granted them shall ever be embraced in any Territory or State; but the U. S. shall forever secure said [Chickasaw] Nation from, and against, all laws except such as from time to time may be enacted in their own National Councils, not inconsistent with the Constitution, Treaties, and Laws of the United States; and except such as may, and which have been enacted by Congress, to the extent that Congress under the Constitution are required to exercise a legislation over Indian Affairs. But the [Chickasaws], should this Treaty be ratified, express a wish that Congress may grant to the [Chickasaws] the right of punishing by their own laws, any white man who shall come into their nation, and infringe any of their national regulations.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE O'CONNOR, and JUSTICE SOUTER join, concurring in part and dissenting in part.

I dissent from the portion of the Court's decision that permits Oklahoma to tax the wages that (1) the Tribe pays (2) to members of the Tribe (3) who work for the Tribe (4) within Indian country, but (5) who live outside Indian country, and, apparently, commute to work. The issue is whether such a tax falls within the scope of a promise this Nation made to the Chickasaw Nation in 1837—a promise that no "State shall ever have a right to pass laws for the government of the [Chickasaw] Nation of Red People and their descendants . . . but the U. S. shall forever secure said [Chickasaw] Nation from, and against, all laws" except those the Tribe made itself (and certain others not relevant here). Treaty of Dancing Rabbit Creek, 7 Stat. 333 (1830) (see the Appendix to the opinion of the Court); Treaty of Jan. 17, 1837, 11 Stat. 573. In my view, this language covers the tax.

For one thing, history suggests that the signatories to the Treaty intended the language to provide a broad guarantee that state law would not apply to the Chickasaws *if* they moved west of the Mississippi River—which they did. The promise's broad reach was meant initially to induce the Choctaws to make such a move in 1830, and it was extended, in 1837, to the Chickasaws for the same reason, all with the hope that other tribes would follow. See A. DeRosier, Removal of the Choctaw Indians 46, 100–128 (1970); *id.*, at 104 (quoting, among other things, President Jackson's statement to Congress, in 1829, that "if the Indians remained east of the Mississippi River, they would be subject to the laws of the several states," but, if they accepted the Treaty and moved west, they would be "free of white men except for a few soldiers").

For another thing, the language of this promise, read broadly and in light of its purpose, fits the tax at issue. The United States promised to secure the "[Chickasaw] Nation from, and against, *all* laws" for the government of the Nation, except those the Nation made itself or that Congress made. Treaty of Dancing Rabbit Creek, *supra* (emphasis added). The law in question does not fall within one of the explicit exceptions to this promise. Nor need the Court read the Treaty as creating an additional implied exception where, as here, the law in question likely affects significantly and directly the way in which the Tribe conducts its affairs in areas subject to tribal jurisdiction—how much, for example, it will likely have to pay workers on its land and what kinds of tribal expenditures it consequently will be able to afford. The impact of the tax upon tribal wages, tribal members, and tribal land makes it possible, indeed reasonable, to consider Oklahoma's tax (insofar as it applies to these tribal wages) as amounting to a law "for the government of" the Tribe. Indeed, in 1837, when the United States made its promise to the Chickasaws, the law considered a tax like the present one to be a tax on its source—*i. e.*, the Tribe

itself. See, *e. g.*, *Dobbins* v. *Commissioners of Erie Cty.*, 16 Pet. 435, 445–448 (1842) (Federal Government employee salaries exempt from state tax laws). Although tax law subsequently changed, see *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 480 (1939), the empirical connection between tax and Tribe has not. The Treaty's basic objective, namely, practical protection for the Tribe, suggests that this unchanging empirical impact, rather than shifting legal tax theory, is the critical consideration.

The majority sets forth several strong arguments against the Treaty's application. But, ultimately, I do not find them convincing. It is true, as the majority points out, that well-established principles of tax law permit States to tax those who reside within their boundaries. It is equally true that the Chickasaws whom Oklahoma seeks to tax live in the State at large, although they work in Indian country. But, these truths simply pose the question in this case: Does the Treaty provide an *exception* to well-established principles of tax law, roughly the same way as do, say, treaties governing diplomats and employees of international organizations? See, *e. g.*, *Toll* v. *Moreno,* 458 U. S. 1, 14–15 (1982) (explaining that some such individuals are exempt from federal, state, and local income taxation). The statement of basic tax principles, by themselves, cannot provide the answer.

The majority is also concerned about a "line-drawing" problem. If the Treaty invalidates the law before us, what about an Oklahoma tax, for example, on residents who work for, but are not members of, the Tribe? I acknowledge the problem of line drawing, but that problem exists irrespective of where the line is drawn here. And, because this tax (1) has a strong connection to tribal government (*i. e.*, it falls on tribal members, who work for the Tribe, in Indian country), (2) does not regulate conduct outside Indian country, and (3) does not (as the Solicitor General points out) represent an effort to recover a proportionate share of, say, the cost of providing state services to residents, I am convinced that it

falls on the side of the line that the Treaty's language and purpose seek to prohibit. To decide that the Treaty prohibits the law here is not to decide whether or not it would prohibit a law with a weaker link to tribal government or a stronger impact outside Indian country.

One final legal consideration strengthens the conclusion I reach. The law requires courts to construe ambiguous treaties in favor of the Indians. *County of Oneida* v. *Oneida Indian Nation of N. Y.*, 470 U. S. 226, 247 (1985). The majority believes that even a "liberal construction cannot save the Tribe's claim," *ante*, at 466, because the Treaty says that the United States is "obliged to secure to the said [Chickasaw] Nation . . . the jurisdiction and government of all the persons and property that may be *within their limits* west." Treaty of Dancing Rabbit Creek, 7 Stat. 333–334 (emphasis added). This language, when viewed in its historical context, however, seems primarily designed to point out that the Treaty operates only in respect to Chickasaw lands west of the Mississippi—*i. e.*, that the Chickasaws would receive no protection unless they moved there. Regardless, the Oklahoma tax in question does affect "persons," namely, tribal members, and "property," namely, their wages, which members work and which wages are paid well "within" the Nation's "limits," *i. e.*, in Indian country. Admittedly, the quoted language, by itself, does not say for certain that such effects are sufficient to bring the state law within the Treaty's prohibition, but neither does it clearly make residency (rather than, say, place of employment) an absolute prerequisite. In these circumstances, the law requires us to give the Tribe the benefit of the doubt.

Thus, in my view, whether we construe the Treaty's language liberally or literally, Oklahoma's tax falls within its scope. For these reasons, I believe the Treaty bars the tax. And, although I join the remainder of the Court's opinion, I respectfully dissent on this point.