**PRAIRIE BAND POTAWATOMI NATION, Plaintiff–Appellant,**

v.

**Stephen S. RICHARDS, Secretary of the Kansas Department of Revenue, Defendant–Appellee,**

---

Winnebago Tribe of Nebraska, HCI Distribution, The Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas, The Iowa Tribe of Kansas and Nebraska, and The Sac and Fox Nation of Missouri, Amici Curiae.

No. 03–3218.

United States Court of Appeals, Tenth Circuit.

Aug. 11, 2004.

David Prager, III, Tribal Attorney, Prairie Band Potawatomi Nation, Mayetta, KS, for Plaintiff–Appellant.

John Michael Hale, Special Assistant Attorney General, Kansas Department of Revenue, Topeka, KS, for Defendant–Appellee.

Vernle C. Durocher, Jr., Mary J. Streitz, and Christopher R. Duggan of Dorsey & Whitney LLP, Minneapolis, MN; Thomas E. Wright of Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS; and Mark Hubble, Tribal Attorney, Winnebago Tribe of Nebraska, Winnebago, NE, for Winnebago Tribe of Nebraska and HCI Distribution; Ilse L. Smith, P.C., Kansas City, MO, for Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas; Mark S. Gunnison of Payne & Jones, Chartered, Overland Park, KS, for Iowa Tribe of Kansas and Nebraska; and Thomas Weathers of Alexander, Berkey, Williams & Weathers LLP, Berkeley, CA, for the Sac and Fox Nation of Missouri in Kansas and Nebraska, submitted a brief for amici curiae.

Before LUCERO, McKAY, and HARTZ, Circuit Judges.

McKAY, Circuit Judge.

This case addresses whether federal law prohibits Kansas from collecting its state tax on fuel supplied to an Indian tribe by a non-Indian distributor. Prairie Band Potawatomi Nation (the "Nation") sought to invalidate the fuel tax on grounds that it is preempted by federal law and that it infringes on the Nation's rights of self-government. The district court granted summary judgment for the Secretary of the Kansas Department of Revenue (the "Secretary"), and the Nation brought this appeal.

### Facts

The following facts are undisputed. The Nation is a federally-recognized Indian tribe whose reservation is on United States trust land in Jackson County, Kansas. Aplt.App., Vol. I, at 35. On its reservation, the Nation financed, constructed, and now owns and operates a $35 million casino. *Id.*, Vol. II, at 70. By building this casino, the Nation increased the number of people who travel to this otherwise remote and rural area. *Id.* at 70–71. To accommodate casino patrons and other reservation-related traffic, the Nation financed and built a gas station (the "Nation Station") which is close to the casino and on the same federal trust land. In building the Station, the Nation incurred $1.5 million in construction costs, which included the purchase of a motor fuel handling system with tank storage and monitoring systems to make fuel available to customers. *Id.*, Vol. III, at 22. The Nation Station is tribally-owned and operated, and, as of May 2000, eleven of its fifteen employees were Indians, with seven of those being Nation tribal members. *Id.* at 2–3.

The Nation submitted expert testimony, which the Secretary does not dispute, that "the 'value marketed' by [the] Nation Sta-

tion results from the business generated by the casino and from employees of the casino and [the Nation's] government and residents." *Id.,* Vol. II, at 86. This conclusion is supported by the undisputed evidence that seventy-three percent of the Nation Station's fuel customers are casino patrons and casino employees and another eleven percent live or work elsewhere on the reservation. *Id.; Id.,* Vol. V, at 46; Aple. Br. at 5. The Nation's expert also reported that the Station is a location-dependent business because, "[b]ut for the casino, there would not be enough traffic to support [it] in its current location." Aplt.App., Vol. II, at 86.

The Nation Station sells fuel at fair market prices. Therefore, it cannot and does not advertise an exemption from state fuel taxes. The Nation's expert concluded that "the Nation is not 'marketing a tax exemption' because the price of fuel at the Nation Station is set above cost, including the Nation's tax, and within 2¢ per gallon of the price prevailing in the local market." *Id.* at 84. The Nation also submitted two affidavits—one from the Station's manager and one from the Nation's Treasurer and Tax Commissioner—that support this conclusion. *Id.* at 71; *Id.,* Vol. III, at 161. The Secretary has not controverted the Nation's expert opinion or the Nation's affidavits and does not argue that the Nation sells fuel below market prices.

The Nation imposes a tax on the Station's fuel sales: 16 cents per gallon of gasoline and 18 cents per gallon of diesel (increased to 20 cents for gasoline and 22 cents for diesel in January 2003). Aplt. App., Vol. IV, at 207; Vol. V, at 169. The Station provides the Nation with its sole source of fuel revenue, which amounts to about $300,000 in tribal fuel taxes each year. Aplt.App., Vol. III, at 3. Pursuant to the Nation's Motor Fuel Tax law, this fuel revenue is used for "constructing and maintaining roads, bridges and rights-of-way located on or near the Reservation." *Id.,* Vol. IV, at 208. This includes maintenance on the road that connects the United States Highway 75 to the Nation's casino. The Nation receives no financial assistance from Kansas to maintain this stretch of roadway.

### Discussion

█ In this dispute, the Nation challenges the 1995 amendment to the Kansas *Motor Fuel Tax Act.* Kan. Stat. Ann. §§ 79–3401 to 79–3464f (1997). Pursuant to this amendment, the Kansas Department of Revenue began collecting, for the first time, a tax on motor fuel distributed to Indian lands. The Kansas legislature structured the tax so that its legal incidence is placed on non-Indian distributors. Kan. Stat. Ann. § 79–3408(c); *Sac and Fox Nation of Missouri v. Pierce,* 213 F.3d 566, 580 (10th Cir.2000). But, the distributors are allowed to pass the tax directly to retailers, like the Nation Station. Kan. Stat. Ann. § 79–3409 ("Every distributor paying such tax or being liable for the payment shall be entitled to charge and collect an amount, including the cost of doing business that could include such tax on motor vehicle-fuels ... sold or delivered by such distributor, as part of the selling price.") The Nation brought suit to enjoin the Secretary from imposing the tax on the Nation's fuel, and the district court granted summary judgment for the Secretary. We review a district court's grant of summary judgment *de novo* to determine whether there is a genuine issue as to any material fact and whether a party is entitled to judgment as a matter of law. *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.,* 245 F.3d 1172, 1175 (10th Cir.2001); *Sac and Fox,* 213 F.3d at 583.

The Nation asks us to invalidate the tax as it applies to the Nation's fuel under two

independent but related doctrines. First, the Nation argues that federal law preempts the tax because federal and tribal interests against state taxation outweigh Kansas' interests in imposing the tax. Second, the Nation argues that the tax is invalid because it impermissibly infringes on its rights of self-government. Either of these doctrines would be sufficient to invalidate the Kansas fuel tax as applied here. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

■■■ We first address whether the tax is preempted by federal law. The constitutional source of federal preemption is Article I, Section 8, Clause 3, which provides: "The Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." When preemption analysis is applied to Indian cases, we consider the unique origins of tribal sovereignty and how it differs from state sovereignty. *Bracker*, 448 U.S. at 143, 100 S.Ct. 2578. Specifically, "[a]mbiguities in federal law have been construed generously in order to comport with [the] traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *Id.* at 143–44, 100 S.Ct. 2578 (citing *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 174–75, and n. 13, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)). "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertions of State authority." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983).

■■ In cases like this—where a tribe is challenging a state tax—"[t]he initial and frequently dispositive question ... is who bears the legal incidence of a tax." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995). "If the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization." *Id.* at 459, 115 S.Ct. 2214. However, where, as here, "the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax; if the balance of federal, state, and tribal interests favors the State, and federal law is not to the contrary, the State may impose its levy...." *Id.*

■■ Although the Secretary argues that the balancing of interests test should be abandoned, citing Justice (now Chief Justice) Rehnquist's partial dissent in *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 176–80, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), circuit precedent requires us to use this balancing test. *See Sac and Fox*, 213 F.3d at 583. The balancing test is "not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Bracker*, 448 U.S. at 145, 100 S.Ct. 2578.

Applying these principles, we conclude that the Kansas tax, as applied here, is preempted because it is incompatible with and outweighed by the strong tribal and federal interests against the tax. The Nation's interests are particularly strong. Tribes have a recognized "interest in raising revenues for essential governmental programs, [and] that interest is strongest when the revenues are derived from value generated on the reservation by activities

involving the Tribes and when the taxpayer is the recipient of tribal services." *Colville,* 447 U.S. at 156–57, 100 S.Ct. 2069.

Here, the Nation's fuel revenues are derived from value generated primarily on its reservation. In determining reservation value, the unique facts of this case require us to look beyond the physical fuel (the Nation receives its fuel in "ready to sell" condition) and to view the Nation's fuel sales as an integral and essential part of the Nation's on-reservation gaming enterprise. *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 219–20, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (balancing tribal and state interests by examining the bingo enterprise as including the facilities and ancillary services offered to patrons); *Bracker,* 448 U.S. at 145–51, 100 S.Ct. 2578 (weighing the tribe's general economic interest in its timber industry to invalidate a state motor carrier license tax and a use fuel tax applied to non-Indians doing business with the tribe); *Indian Country U.S.A., Inc. v. Oklahoma ex rel. Oklahoma Tax Comm'n,* 829 F.2d 967, 986 (10th Cir.1987) (weighing the tribe's interest in its bingo enterprise as a "form of entertainment"); *Gila River Indian Community v. Waddell,* 967 F.2d 1404, 1410 (9th Cir.1992) (weighing the state interests in taxing tickets to on-reservation events and concessionary items against the tribes' "involvement in the production of the entertainment events which take place on its reservation").

The close nexus between the Nation's fuel sales and its gaming enterprise is critical to our analysis here. When we recently reviewed the Kansas fuel tax as it applied to a tribe's retail station alone, we held that "the revenues resulting from the Tribes' retail fuel sales to non-Indian consumers traveling from outside Indian lands is not derived from value 'generated on the reservations by activities in which the Tribes have a significant interest.'" *Sac and Fox,* 213 F.3d at 585 (quoting *Colville,* 447 U.S. at 155, 100 S.Ct. 2069) (remanding to develop an adequate record to balance tribal and state interests). There, we also held that we would not invalidate the state tax solely on the ground that it would decrease tribal sales to non-Indians, particularly where the tribes' "fuel market exists only because of the Tribes' claimed exemption from the [state] fuel tax." *Id.* Here, in contrast, the Nation's fuel sales are derived from value generated on its reservation because its fuel marketing is integral and essential to the gaming opportunity the Nation provides. Also, unlike in *Sac and Fox,* the Nation's fuel market does not exist because of a claimed state tax exemption; rather, the Nation created a new fuel market by financing and building its gaming facilities. This is clear from both the undisputed expert testimony that the Station's fuel market only exists because of the Nation's casino and from the undisputed fact that seventy-three percent of the Station's fuel patrons are casino patrons and employees. For these reasons, we balance the competing interests by viewing the Nation's fuel revenues as being derived primarily from value generated on its reservation.

In balancing the interests, both the district court and the Secretary heavily relied on *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), to conclude that Kansas' interests in taxation outweigh the competing federal and tribal interests. Aplt.App., Vol. V, at 64–65; Aple. Br. at 30–31. In *Colville,* the Court upheld state taxes applied to on-reservation retail sales of cigarettes and tobacco products because "[w]hat the smokeshops offer ... is solely an exemption from state taxation." *Id.* at 155, 100 S.Ct. 2069. "It is painfully apparent," the Court said, "that the value marketed by

the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest." *Id.* The Court then validated the state tax, holding that "[w]e do not believe that principles of federal Indian law, whether stated in terms of preemption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere." *Id.*

We distinguish *Colville* in two critical ways. First, in stark contrast to the smokeshops in *Colville,* the Nation is not marketing an exemption from state taxes. The undisputed evidence is that the Nation sells its fuel at fair market prices. Aplt. App., Vol. II, at 71, 84; Vol. III, at 161. Thus, a central component to the reasoning of *Colville* is inapplicable here.

Second, unlike in *Colville,* the Nation is not merely importing a product for resale to non-Indians; rather, the revenues from the Nation's fuel to non-Indian consumers are derived from value "generated on the reservation[ ] by activities in which [the Nation has] a significant interest." *Colville,* 447 U.S. at 155, 100 S.Ct. 2069. It is undisputed that when the Nation financed and built its $35 million casino to attract non-Indian patrons, it created a new fuel market for an otherwise remote area. After creating this new market, the Nation financed and built the Station to offer fuel to its casino patrons and other reservation-related traffic.

The Supreme Court has acknowledged this second distinction when it distinguished *Colville* where tribes "are not merely importing a product onto the reservations for immediate resale to non-Indians" but have created an entertainment enterprise designed to attract non-Indian consumers onto its reservation. *Cabazon,* 480 U.S. at 219, 107 S.Ct. 1083. In *Caba-*

*zon,* the Supreme Court held that the federal and tribal interests outweighed state interests in regulating bingo and other games because, unlike in *Colville,* the tribes

have built modern facilities which provide recreational opportunities and ancillary services to their patrons, who do not simply drive onto the reservations, make purchases and depart, but spend extended periods of time there enjoying the services the Tribes provide. The Tribes have a strong incentive to provide comfortable, clean, and attractive facilities and well-run games in order to increase attendance at the games.

*Id.* As in *Cabazon,* the Nation built a modern casino and ancillary services, like the Nation Station, in order to offer its patrons an attractive entertainment opportunity. Here, seventy-three percent of the Nation Station's fuel customers are casino patrons and employees. Aplt.App., Vol. II, at 86. These patrons, like those in *Cabazon,* spend extended amounts of time using the entertainment services offered by the Nation. Thus, the Nation's fuel revenues are derived from activities—that is, drawing non-Indians to its gaming enterprise—in which the Nation has a significant interest.

The Nation's interests here are strengthened because of its need to raise fuel revenues to construct and maintain reservation roads, bridges, and related infrastructure without state assistance. It is undisputed that the Nation's only source of fuel revenue comes from the Nation Station. *Id.,* Vol. III, at 3. Fuel revenue is typically used to pay for a government's infrastructure expenses, and, in this case, the Nation's Motor Fuel Tax law specifically requires that all fuel revenue (approximately $300,000 per year) be used for "constructing and maintaining roads, bridges and rights-of-way located on or

near the reservation." *Id.,* Vol. IV, at 208. The Nation has the financial responsibility for the majority of the roads and bridges on and near its reservation. *Id.,* Vol. III, at 22–23. Of particular importance here, the Nation has an ongoing and future responsibility to maintain the stretch of roadway that connects the United States 75 Highway (the main highway leading to the reservation) with the casino. *Id.* at 23. "The Nation spent approximately $1.2 million in 1997 and 1998 to improve and pave 1½ miles of 150th Road from the casino to U.S. 75 Highway and to make major improvements to the 150th Road and U.S. 75 Highway intersection." *Id.* Thus, the Nation used its fuel revenues to provide better access from the main federal highway to its casino. Kansas does not contribute funds to cover the costs of maintaining this access road.

The Secretary argues that the Nation could continue collecting fuel revenues from the Nation Station by imposing its tax in addition to the state tax. But the Nation's expert explained that this is not economically feasible. He reported that

> [b]asic economic theory teaches that the [Nation Station] cannot charge prices high enough to allow collection of both the Kansas and [the Nation's] fuel taxes. Motor fuel is a commodity and cannot be differentiated enough to permit disparate pricing in the same geographic market. Therefore, the Tribal and State taxes are mutually exclusive and only one can be collected without reducing the [Nation Station's] fuel business to virtually zero.

Aplt.App., Vol. II, at 89. The Secretary has not submitted contradictory evidence and has not argued that this opinion is either incorrect or exaggerated. The "economic realities of the situation [ ] both in the presence and absence of the motor fuel tax" are relevant in balancing the compet-

ing interests. *Sac and Fox,* 213 F.3d at 585; *see also Colville,* 447 U.S. at 157–58, 100 S.Ct. 2069 (noting that a tribe bears the burden of showing that its smokeshop businesses would be significantly reduced absent a credit for tribal taxes paid). This economic reality adds to the Nation's already strong interests against taxation.

The Nation's interests in this case are aligned with strong federal interests in promoting tribal economic development, tribal self-sufficiency, and strong tribal governments. These federal goals are stated in numerous Acts of Congress, Executive Branch policies, and judicial opinions. *See generally* Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, § 2704(4) (2001); Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479 (2001); Indian Self–Determination and Education Assistance Act of 1975, 25 U.S.C. § 450f (2001); *see also* Presidential Proclamation 7500 of November 12, 2001, 66 Fed.Reg. 57641 (Nov. 15, 2001) ("We will protect and honor tribal sovereignty and help to stimulate economic development in reservation communities."); Presidential Executive Order 13175, 65 Fed.Reg. 67249, Consultation and Coordination With Indian Tribal Governments, § 2(c), (Nov. 6, 2000) ("[T]he United States recognizes the right of Indian tribes to self-government and supports tribal sovereignty and self-determination."); *Bracker,* 448 U.S. at 143–44, 100 S.Ct. 2578 (noting "a firm federal policy of promoting tribal self-sufficiency and economic development" as evidenced by various congressional enactments); *Colville,* 447 U.S. at 155, 100 S.Ct. 2069 (recognizing "varying degrees [of] congressional concern with fostering tribal self-government and economic development").

Against these strong tribal and federal interests, the sole interest Kansas asserts is its general interest in raising revenues. Of course, states have a "legitimate gov-

ernmental interest in raising revenues, and that interest is ... strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services." *Colville*, 447 U.S. at 157, 100 S.Ct. 2069. Here, Kansas' interest is not at its strongest. The tax is directed at fuel which, under the particular circumstances of this case, is derived primarily from value generated on the reservation. Also, Kansas does not provide any financial assistance in maintaining the access roadway from the United States 75 Highway to the casino. The ongoing and future obligation to upkeep this stretch of roadway is exclusively the Nation's, and the Nation's only source of fuel revenue (which is designated for this obligation) comes from the Station. Under these facts, Kansas' generalized interest in raising revenues is insufficient to justify its tax.

Therefore, we invalidate the Kansas Motor Fuel Tax as it applies to the Nation's fuel because the balance of tribal, federal, and state interests prohibits state taxation as a matter of law. Although Kansas has a legitimate interest in raising revenue, this general interest is insufficient to justify the tax under these particular facts because it interferes with and is incompatible with strong tribal and federal interests against taxation.

**REVERSED.**