TOREUELLA, Circuit Judge
(Dissenting).
Although I join Judge Lipez’s cogent dissent, I write separately to add a few additional points of my own.
I dissent from the majority’s holding because I believe that the majority ignores Supreme Court precedent—some of which is 150 years old, see, e.g., In re Kansas Indians, 5 Wall. 737, 72 U.S. 737, 760, 18 L.Ed. 667 (1866)—in two significant ways. First, it brushes aside the Supreme Court’s consistent guidance that a waiver or abrogation of sovereign immunity must be unequivocal and explicit. See, e.g., Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (noting that “[i]t is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed”) (internal quotation marks and citations omitted). Second, even assuming arguendo that there was some ambiguity about whether there has been a waiver or abrogation of sovereign immunity in this case, the majority fails to take into account the so-called Indian canon of construction—i.e., that “statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.” Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). This is most unfortunate, for the majority chooses to disregard a long-standing policy rule of obvious necessity and importance in the trust relationship between the United States and Indian nations. See Choate v. Trap, 224 U.S. 665, 675, 32 S.Ct. 565, 56 L.Ed. 941 (1912) (noting that in the construction of a statute dealing with Indians, “doubtful expressions ... are to be resolved in favor of *40 a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years ...” (emphasis added)). See also Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918); Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930); Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943); McClanahan v. Arizona State Tax Comm’n, 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 656 n. 7, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1973).
With reference to the application and enforcement of state laws to Indian tribes, the Supreme Court has held in a number of instances that “[tjhere is a difference between the right to demand compliance with state laws and the means available to enforce them.” Kiowa Tribe of Okla. v. Manufacturing Techs., Inc., 523 U.S. 751, 755, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998); Okla. Tax Comm'n. v. Citizen Band of Potawatomi Tribe of Okla., 498 U.S. 505, 513-14, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991). The matter before this Court involves the enforcement by a state of its law against an Indian tribe qua tribe.
Although this case directly concerns only the Narragansett Indian Tribe (the “Narragansetts” or “the Tribe”), whose ancestral lands [16] are located in what is today part of the State of Rhode Island (“Rhode Island” or “the State”), this Court has before it a neuralgic issue of import that extends beyond this specific appeal. If the views adopted by the majority regarding the power of Rhode Island to enforce its laws directly against the Tribe qua tribe ultimately prevail, the concept of tribal sovereignty developed by the Supreme Court, Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (Indian tribes retain all sovereignty not specifically withdrawn by Congress), will be radically altered, and Native American tribal governments throughout the United States[17] may very well become irrelevant facades. See Bryan v. Itasca County, 426 U.S. 373, 388, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (Congress did not intend, when extending civil and criminal jurisdiction of states to Indian reservations to undermine or destroy such tribal governments as did exist, or to convert the affected tribes into little more than private, voluntary organizations).
The record of this case establishes that on July 14, 2003, members of the Rhode Island State Police entered Narragansett tribal land to execute a search warrant *41 issued by a Rhode Island state court, authorizing the search of a smoke shop located on tribal lands and owned by the Tribe. The police officers found quantities of cigarettes in the smoke shop which did not have the appropriate tax stamps affixed as required by state law, R.I. Gen. Laws § 44-20-453, and proceeded to confiscate them as contraband, id. § 44-20-37, after overcoming the physical resistance of various tribal officers and members who considered the actions of the State’s officers a violation of the Tribe’s sovereignty.
Rhode Island alleges that its actions constituted a valid exercise of its substantive and jurisdictional powers pursuant to § 1708(a) of the Rhode Island Indian Claims Settlement Act, 25 U.S.C. §§ 1701 et seq. (“Settlement Act”), and Paragraph 13 of the “Joint Memorandum of Understanding Concerning the Settlement of the Rhode Island Settlement Lands” (“JMOU”).
Paragraph 13 of the JMOU, which predates the Settlement Act and was entered into in 1978, states that
except as otherwise specified in this memorandum, all Laws of the State of Rhode Island shall be in Ml force and effect on the Settlement Lands.
Section 1708(a) reads as follows:
Except as otherwise provided in this Act, the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island.
The State points to the language of the JMOU for support of its contention that the Tribe has waived its tribal sovereignty and immunity. It also argues that in any event, the language of the Settlement Act demonstrates unequivocally that Congress has abrogated tribal sovereign immunity. During oral argument, the State -further expanded its position, claiming that by virtue of these provisions the Narragansetts relinquished all claims to tribal sovereignty and immunity and retained no semblance or residue of sovereignty or immunity that could be validly interposed by the Tribe qua Indian tribe against the actions of Rhode Island.
The majority seizes upon this argument by the State to rule upon an issue that, according to the law of this case, is not before us.[18] I choose to overlook this error by the majority because the merits of the issue ultimately make the point irrelevant. It is nevertheless symptomatic of the manner in which the majority runs roughshod over Supreme Court and First Circuit precedent to reach its desired outcome.
It is essential to understand that but for a valid waiver or abrogation of tribal sovereignty, the State’s enforcement actions against the Tribe qua tribe were illegal. Consequently, the key issue in this case is determining whether there has been any such waiver or abrogation.
It is clear that when tested against longstanding principles of Indian law, the sweeping asseverations made by the State regarding waiver and abrogation are lacking in substance. Tribal sovereignty, and concomitantly, tribal sovereign immunity, *42 may not be stripped from an Indian tribe by statutory silence or by inference extracted from ambiguous language:
Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers ... [Although] [t]his aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress!,] .. . without congressional authorization, the Indian Nations are exempt from suit. It is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed.
Santa Clara Pueblo, 436 U.S. at 58, 98 S.Ct. 1670 (emphasis supplied) (internal quotation marks and citations omitted). See also Kiowa, 523 U.S. at 754, 118 S.Ct. 1700 (“As a matter of federal law a tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity.”); Montana, 450 U.S. at 544, 101 S.Ct. 1245 (Indian tribes retain all sovereignty not specifically withdrawn by Congress).
It is “[w]ith these considerations of ‘Indian sovereignty ... [as] a backdrop against which the applicable ... federal statut[e] must be read’ ”. Santa Clara Pueblo, 436 U.S. at 60, 98 S.Ct. 1670 (citing McClanahan, 411 U.S. at 172, 93 S.Ct. 1257). I have searched exhaustively for any language unequivocally expressing the waiver or abrogation of tribal sovereignty (or the included tribal sovereign immunity) in either the JMOU or § 1708(a), but alas no such provision is to be found. In fact, neither the term “tribal sovereignty” nor “tribal sovereign immunity” are even mentioned in either stipulation. Such tombstone silence can hardly be considered an “unequivocal expression” indicating that either a waiver or an abrogation has taken place.
Although the lack of such specificity makes any search of the legislative history unnecessary and irrelevant, In re Rivera Torres, 432 F.3d 20, 32 (1st Cir.2005) (Tor-ruella, J., concurring), in an abundance of caution I have also looked for any language indicative of Congressional abrogation of these tribal rights in the scant legislative history of the Settlement Act that is available. Again, I have come up empty-handed. The House Report that accompanied the Settlement Act is silent on the subject of either tribal sovereignty or tribal sovereign immunity, much less of language specifically abrogating those rights. See H.R. Rep. 95-1453, 1978 U.S.C.C.A.N. 1948.
What § 1708 means is that the State’s laws and jurisdiction apply within the tribal lands to individuals, both Indians and non-Indians, and also that those laws can be enforced against those individuals. Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001). Were § 1708(a) not in place, Rhode Island law could not be applied within tribal lands at all. See Title III, 25 U.S.C. §§ 1321-1326; McClanahan, 411 U.S. at 170-71, 93 S.Ct. 1257. However, the application and enforcement of state law against individuals within tribal lands by virtue of § 1708, and actions by the state which involve the enforcement of those laws directly against the Tribe qua tribe are totally different concepts. Kiowa, 523 U.S. at 755, 118 S.Ct. 1700. Thus, as an example, because of the doctrine of tribal sovereign immunity, a state cannot without specific Congressional approval sue an Indian tribe to collect unpaid taxes notwithstanding that those state laws may be applicable to individuals within tribal lands. Potawatomi, 498 U.S. at 510, 111 S.Ct. 905 (recognizing tribal immunity from suit to collect unpaid cigarette taxes). Nor, absent Congressional abrogation or waiver of tribal immunity, can an Indian tribe be sued for gov *43 ernmental or even commercial activities, whether conducted on or off a reservation. Kiowa, 523 U.S. at 754-55, 118 S.Ct. 1700.
In fact, the panel sustained the validity of the state tax at issue in this case because “the legal incidence of the Rhode Island cigarette tax falls on the consumer, not the Narragansett Tribe.” Narragansett Indian Tribe of Rhode Island v. State of Rhode Island, 407 F.3d 450, 459 (1st Cir.2005). The panel also stated in its opinion that
[i]f the legal incidence of the cigarette tax falls on the Tribe itself, it presents serious tribal sovereignty concerns that might preclude the State from enforcing its tax due to the United States’ recognition of the Narragansetts as a sovereign Indian tribe. Oklahoma Tax Comm’n v. Chickasaw Nation, 515 U.S. 450, 458-59, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (citing Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 483, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976)). Such a “tax cannot be enforced absent clear congressional authorization.” Chickasaw Nation, 515 U.S. at 459, 115 S.Ct. 2214.
Id. at 456.[19]
The present situation is comparable to that presented by cases and statutes involving federal enclaves in which the federal government, in addition to enforcing federal law within those enclaves, has consented to the concurrent application and jurisdiction of state laws against individuals within those lands. See, e.g., Assimila-tive Crimes Act, 18 U.S.C. § 13(a) (assimilating into federal law, and thereby making applicable on federal enclaves such as Army bases, certain criminal laws of the state in which the enclave is located); Lewis v. United States, 523 U.S. 155, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998). Such duality of jurisdiction, however, clearly does not constitute a waiver of sovereign immunity by the federal government absent a specific relinquishment by the United States, as is seen, for example, with the Federal Tort Claims Act. See 28 U.S.C. § 1346(b)(1) (waiving sovereign immunity with respect to certain categories of torts committed by federal employees in the scope of their employment); FDIC v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); Bolduc v. United States, 402 F.3d 50, 55 (1st Cir.2005).
There are further indications that no abrogation was intended by Congress by virtue of the limited language in the Settlement Act. In 1978, when Congress enacted that statute, it only provided for Rhode Island law and jurisdiction to apply in the “settlement lands.” 25 U.S.C. § 1708 (emphasis supplied). However, only two years later when under similar circumstances it passed the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. § 1725, Congress expressly provided that the State of Maine would have jurisdiction over “all Indians, Indian nations, or tribes or bands of Indians ... and any lands or natural resources owned by any such Indian, Indian nation, tribe or band of Indians and any lands or natural resources held in trust by the United States” (emphasis supplied). I cannot countenance that the omission of the “tribal” language from the Settlement Act was an unintended oversight by Congress without any purpose in mind. See Brewster v. Gage, 280 U.S. 327, 337, 50 S.Ct. 115, 74 L.Ed. 457 (1930) *44 (“The deliberate selection of language so differing from that used in ... earlier acts indicates a change of law was intended.”). This rule of statutory interpretation even holds true with regard to the addition or omission of particular language within a given statute. See Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (“[When] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.”).
In interpreting the Maine statute containing the express inclusion of the aforementioned “tribal” language by Congress, this Court held as recently as April 15, 2005 that the mere threat of am, investigation by the Maine Human Rights Commission under Maine law of an alleged discrimination charge against the Miemac Tribe “constitute[d] ‘enforcement’ ” because, in effect, such action threatened “tribal sovereignty, self-governance, and sovereign immunity,” and that such an allegation was sufficient to state a federal cause of action against the State of Maine by the Micmac Tribe. Aroostook Band of Micmacs v. Ryan, 404 F.3d 48, 65-66, 68 (1st Cir.2005) (tribal sovereign immunity means that a tribe "is not amenable to state judicial or quasi-judicial proceedings to enforce those laws.”). See also Bishop Painte Tribe v. County of Inyo, 275 F.3d 893 (9th Cir.2002) (holding that execution of warrant against a tribe to obtain employee records violated tribal sovereign immunity), vacated on other grounds sub nom. Inyo County v. Paiute-Shoshone Indians, 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003). If the mere threat of an investigation constituted prohibited enforcement sufficient to allow7 a federal cause of action to be stated alleging a violation by Maine of the Micmacs’ tribal sovereignty, notwithstanding the fact that the Maine Settlement Act is incrementally more expansive in its language than the earlier enacted Rhode Island Settlement Act, what can be said of Rhode Island’s infinitely more intrusive action of entering tribal lands and forcibly confiscating tribal property?[20]
What can be said is, first of all, that these are all actions directly affecting the Tribe’s sovereignty qua tribe, for the State’s invasion is a serious encroachment upon one of the most basic components of the Narragansett tribal government, its treasury. Furthermore, it can be said, these are extreme actions that clearly have not been authorized by any act of Congress. Applying fundamental principles of Indian law to these two propositions there should be no question but that the State’s actions directed against the Tribe constituted a clear and egregious violation of its tribal sovereignty.
This is a result that is hinted at by the Supreme Court in Wash. v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), even if not specifically decided therein. Id. at 162, 100 S.Ct. 2069. In Colville, pursuant to Public Law 280, the State of Washington was granted almost *45 identical civil and criminal jurisdiction on Colville Indian lands as in the case of Rhode Island regarding the Narragan-setts’ lands. Additionally, as with the Narragansetts, the Colville Tribe was selling cigarettes in a tribal shop without complying with Washington’s tax stamp laws. The Court, in concluding that, the State of Washington had sufficient interest in enforcing its valid tax laws to justify seizures of shipments of unstamped cigarettes as contraband while they were traveling to the reservation, stated that, “[b]y seizing cigarettes en route to the reservation, the State polices against wholesale evasion of its own valid taxes without unnecessarily intruding on core tribal interests.” Id. at 162,100 S.Ct. 2069.
Rhode Island instead chose the confrontational alternative of a Rambo-like raid, totally invasive of those core tribal interests. Although “[tjhere is no doubt that sovereign immunity bars [Rhode Island] from pursuing the most efficient remedy” [a lawsuit against the Tribe], this is not to say “that it lacks any adequate alternatives.” Potawatomi, 498 U.S. at 514, 111 S.Ct. 905. Among those remedies suggested by the Supreme Court, id., are the holding of individual agents or officers of the Tribe liable in actions brought by the State, see Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); the collection of the sales tax from cigarette wholesalers by seizing unstamped cigarettes off the reservation, Colville, 447 U.S. at 161-62, 100 S.Ct. 2069; or the assessment of wholesalers who supplied unstamped cigarettes to the tribal stores. City Vending of Muskogee, Inc. v. Okla. Tax Comm’n, 898 F.2d 122 (10th Cir.1990). Rhode Island could also “enter into agreements with the [T)ribe[ ] to adopt a mutually satisfactory regime for the collection of this sort of tax.” Potawatomi, 498 U.S. at 514, 111 S.Ct. 905. Lastly, Rhode Island can also ask Congress for a specific abrogation of tribal sovereignty, ul., an endeavor which should not prove to be insurmountable considering the imbalance of political forces at stake.
What is conspicuously absent from this laundry list of alternative remedies available to the State of Rhode Island is any remedy involving the State’s use of its coercive police power directly against the Narragansett Tribe itself. Rhode Island presently lacks the ability to use such powers directly against the Tribe. Accordingly, I respectfully dissent from the majority’s holding to the contrary.

. In 1880, the Tribe sold all of its lands with the exception of two acres for the sum of $5,000, all in violation of the Indian Noninter-course Act, 25 U.S.C. § 177, designed to protect Indians from being taken advantage of, and declaring void ab initio the sale of Indian lands to non-Indians unless previously authorized by the federal government. Since 1988, the Settlement Lands have been held in trust bv the United States. See Carcieri v. Norton, 423 F.3d 45, 50-51 (1st Cir.2005).

. Particularly affected are other tribes subject to settlement acts. See, e-.g., Florida Indian Land Claims Settlement Act of 1982, 25 U.S.C. §§ 1741 et seq.; Mashantucket Pequot: Indian Claims Settlement Act of 1983, 25 U.S.C. §§ 1751 et seq.; Seminole Land Claims Settlement Act of 1987, 25 U.S.C. §§ 1772 et seq.; Wampanoag Tribal Council of Gayhead, Inc., Indian Claims Settlement Act 1987, 25 U.S.C, §§ 1771 et seq.; Seneca Nation Settlement Act of 1990, 25 U.S.C. §§ 1774 el seq.; Aroostook Band of Micmacs Settlement Act of 1991, Pub.L. No. 102-171, 105 Stat. 1143 (1991); Mohegan Nation of Connecticut Land Claims Settlement Act of 1994, 25 U.S.C. §§ MIS et seq.

. More specifically, this Court, in granting the petition for en banc, withdrew only Parts 11(D)(3) and (4) of the original panel opinion. This left intact all the other parts of the opinion, including Part 11(D)(1) of the panel opinion, where the panel held that the Tribe's sovereign immunity remained intact despite the grant of jurisdiction to the State. This conclusion, therefore, remains the “law of the case." See majority opinion at 21, n. 3 (noting that because the en banc court, in granting rehearing, chose not to revisit the issue of whether the Tribe must comply with the State's cigarette tax scheme when selling cigarettes on the settlement lands, the panel's original holding on that issue remained intact and therefore became the law of the case).

. It should be pointed out that this ruling by the panel affirmed the district court's finding about the applicability and incidence of the tax. The panel’s ruling, in turn, was affirmed by the en banc court, since, as the majority correctly notes, the panel’s ruling regarding the applicability and incidence of the tax was not withdrawn by the Court's decision to grant rehearing en banc in this case.

. The State's contention that its authority to search and seize the Tribe’s property is not dependent on the search warrant because the State is independently authorized to elfecluate this action pursuant to Rhode Island law, R.I. Gen. Laws § 44-20-37, is unavailing. “(Tlribal immunity is a matter of federal law and is not subject to diminution by the States." Kiowa, 523 U.S. at 756, 118 S.Ct. 1700; see also Three Affiliated Tribes of Fort Berthold Reservation v. Wold Engineering, P.C., 476 U.S. 877, 891, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986) (same); Wash. v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (same).