*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0084p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

KEWEENAW BAY INDIAN COMMUNITY,

*Plaintiff-Appellant,*

v.

No. 05-2398

JAY RISING; HARROLD REID; TIMOTHY BLANKSVARD,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 03-00111—Robert Holmes Bell, Chief District Judge.

Argued: September 11, 2006

Decided and Filed: February 28, 2007

Before: BOGGS, Chief Judge; MARTIN, Circuit Judge; OLIVER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Vernle C. Durocher, DORSEY & WHITNEY, Minneapolis, Minnesota, for Appellant. Elaine Dierwa Fischhoff, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Vernle C. Durocher, Mary J. Streitz, DORSEY & WHITNEY, Minneapolis, Minnesota, John R. Baker, Baraga, Michigan, Stephen D. Turner, CLARK HILL, Grand Rapids, Michigan, for Appellant. Elaine Dierwa Fischhoff, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. The Keweenaw Bay Indian Community is a federally recognized Indian tribe with approximately 3,300 members, 868 of whom live on the Community's Reservation in Michigan's Upper Peninsula, and roughly 500 others who live in neighboring counties. The Community is the successor in interest to the L'Anse and Ontonagon bands of Chippewa Indians. The Community brought this action against Jay Rising, Treasurer of the State of Michigan, and Harrold Reid and Timothy Blanksvard, two Michigan State Police

---

[*] The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

Officers, to challenge the state's efforts to tax tobacco products sold by the Community and several searches and seizures of tobacco products shipped to the Community. The district court dismissed the Community's claims after granting two separate motions for summary judgment brought by the state defendants.

I.

The State of Michigan imposes an excise tax on the sale of tobacco products through its Tobacco Products Tax Act ("TPTA"), Mich. Comp. Laws §§ 205.421-205.436. The TPTA requires those who manufacture, transport and sell tobacco products to obtain a license to "purchase, possess, acquire for resale, or sell a tobacco product." Mich. Comp. Laws § 205.423(1). The TPTA states that its intent is to levy the tobacco tax against the consumers of tobacco products, although it is the licensee's responsibility to collect and account for the tax. Mich. Comp. Laws §§ 205.427a, 205.427(2). In light of the unique sovereign status of Indian tribes located within the state, Michigan cannot tax cigarettes sold on an Indian reservation to tribal members for their own use, unless authorized to do so by Congress. *Wagnon v. Prairie Band Potawatomi Nation*, 126 S. Ct. 676, 681 (2005). At the same time, however, the state can tax sales made by a tribe to individuals who are not tribal members.

In light of these limitations, a state like Michigan is faced with a somewhat complicated collection scheme when, as a general matter, it seeks to collect an excise tax through sellers of tobacco products, which sometimes include Indian tribes. Michigan has approached this situation by entering into agreements with tribes that govern the imposition of taxes on tobacco products, as well as certain other products such as gas and diesel fuel. The Community was party to such an agreement with the state from 1977 until the state terminated it in 1997. During the late 1990s, Michigan began negotiating with eleven of the twelve federally recognized Native American tribes in the state in an effort to enter into comprehensive tax agreements covering multiple tax issues, including cigarette taxes. Revised agreements were reached with eight of the tribes, which give them the option of selling untaxed tobacco products to tribal members who reside within a negotiated Agreement Area under either a quota or a refund system. The state has been unable to reach agreement with the other three tribes, including the Community. Upon the termination of the previous tax agreement in 1997, the Community began to sell tobacco products on its Reservation and trust lands to all of its customers, tribal members and non-members alike, free of the Michigan tobacco products tax.

By letter dated December 8, 1999, Michigan State Treasurer Mark A. Murray informed all of the federally recognized tribes within the state that Michigan had changed the manner in which it would collect Michigan's tobacco and motor fuel taxes.

> To more effectively facilitate the collection of these taxes, the State will now require all wholesalers and/or unclassified acquirers to collect these taxes at the point of sale even where the retail purchaser is an Indian Tribe or tribal-member. In addition, all packs of cigarettes sold at retail from within Indian Country will bear a special stamp applied by the wholesaler to clearly indicate that tax has been paid. . . . The State of Michigan fully recognizes that Indian Tribes and their members are exempt from Michigan's motor fuel and cigarette taxes where the taxed activity takes place within their respective Indian Country. Therefore, retailers located within Indian Country can file for a refund on sales to that Tribe or its members.

As set forth in the letter, the state made available a refund system for tribes that do not have a comprehensive tax agreement with the state, beginning on January 1, 2000. Under the refund system, tribes can purchase taxed tobacco products from entities that are licensed under the TPTA, and subsequently file claims for refunds of the tobacco taxes on sales to their qualified members.

Despite the refund system, the State Treasury Department began receiving numerous complaints from competitors of tribal businesses that the tribes were selling large quantities of cigarettes at a price below the wholesale cost of tax-prepaid cigarettes. The Treasury Department confirmed the complaints through multiple purchases made by its employees of unstamped, untaxed cigarettes from Native American businesses, including some run by the Community and its members. In January 2000 the Michigan State Police Tobacco Tax Team began investigating whether Michigan Indian tribes were importing untaxed tobacco products in violation of the TPTA. The state seized cargos of untaxed cigarettes from delivery trucks in transit to Native American retailers in the Upper Peninsula in 2000 and 2001. In 2001 the state seized untaxed tobacco products being transported to the Community's Pines Convenience Center.

In an effort to prevent further seizures of tobacco products purchased by the Community for retail sale, the Community began arranging to receive tobacco products through the mail rather than by truck delivery. The state police, who had been investigating other potential avenues for the importation of untaxed cigarettes after the seizures made from delivery trucks, were informed by United States postal workers in the Upper Peninsula that cigarettes were being shipped through their mail processing centers. The boxes in which the products were shipped typically contained conspicuous markings, identifying them as tobacco products of a particular brand name. The state police informed the postal inspector in Milwaukee that they were looking for untaxed tobacco products being sent to the Upper Peninsula, and consulted with a state Assistant Attorney General regarding the legal and regulatory requirements for searching parcels shipped through the Postal Service. The state police drafted proposed affidavits and search warrants, in consultation with the Attorney General's Office, in anticipation of seizures of tobacco products.

On January 10, 2002 — three days after contacting the Postal Service — the state police were informed that inspectors for the Kingsford Mail Processing Center near Iron Mountain, Michigan, had discovered fourteen cases of cigarettes sent from New York to addresses in the Upper Peninsula. The state police promptly obtained search warrants and seized the shipment. During this time, additional shipments arrived, which were also seized pursuant to warrants. Four searches were conducted on January 10, 14, 18, and 23, 2002, and the state seized over 180 boxes of tobacco products from the Postal Service mail processing center in Kingsford, Michigan. The boxes were addressed to Joe Waara, WCUP-FM, American Made Tubcraft Plus, Chippewa Trading Co., and Keweenaw Bay Outfitters. Each box contained between 30 and 60 cartons of cigarettes or over 200 cans of snuff. None of the addressees was licensed as an "unclassified acquirer" under the TPTA.[1] According to the Community, the seizures included 44 parcels containing 2,500 cartons of the Community's cigarettes that were intended for sale at the Community's sales facilities.

The Department of Treasury advised the Community that the cigarettes had been seized as contraband. The Community requested an administrative hearing pursuant to Mich. Comp. Laws § 205.429(3). The hearing resulted in a finding that the cigarettes should be forfeited to the state as contraband. The Community unsuccessfully sought review of this order in state court.

After the January 2002 seizures the Community began to follow the state-mandated procedure of purchasing taxed tobacco products and then requesting refunds from the state. Under this

---

[1]The TPTA defines "unclassified acquirer" as follows:
(v) "Unclassified acquirer" means a person, except a transportation company or a purchaser at retail from a retailer licensed under the general sales tax act, 1933 PA 167, Mich. Comp. Laws 205.51 to 205.78, who imports or acquires a tobacco product from a source other than a wholesaler or secondary wholesaler licensed under this act for use, sale, or distribution. Unclassified acquirer also means a person who receives cigars, noncigarette smoking tobacco, or smokeless tobacco directly from a manufacturer licensed under this act or from another source outside this state, which source is not licensed under this act. An unclassified acquirer does not include a wholesaler.

Mich. Comp. Laws § 205.422(v).

procedure, the Community's net revenues from the sale of tobacco products dropped from $556,789 in 2001, to $125,963 in 2002. The Community continued to purchase taxed tobacco products and to file tax refund claims with the Michigan Department of Treasury through April 2004. However, the Department of Treasury refused to issue refund claims totaling $138,260 for August 2003 and December 2003 through April 2004, based on its determination that the Community's sales to its members in August 2003 exceeded the amount of cigarettes that those members could reasonably have been expected to have consumed in a one-year period. The state arrived at its estimated amount based on statistics regarding the Community's population, the Surgeon General's statistics on Native American smoking rates, and empirical data regarding cigarette consumption of other Native American tribes. The state also had evidence that one Community member was purchasing between 100 and 152 cartons of cigarettes per month and selling them over the Internet.

The state's refusal to issue the refunds prompted negotiations between the state and the Community's attorney regarding the number of refundable sales. The state proposed an annual quota or refund ceiling for the Community of 3,281,000 cigarettes, and the Community representatives proposed an annual quota or refund ceiling of over 8,000,000 cigarettes. The negotiations did not result in a resolution.

## II.

The Community filed the present action on May 29, 2003, seeking declaratory and injunctive relief, as well as damages, related to taxation under the Act and the seizures of tobacco products sent by mail to the Community. Named as defendants are State Treasurer Jay Rising, and two officers of the Michigan State Police, Harrold Reid and Timothy Blanksvard, who participated in the seizure of cigarettes at the Kingsford Mail Processing Center. The parties brought cross motions for summary judgment regarding the legality of the tax. On September 30, 2004, the district court issued the first of two summary judgment orders, granting in part the defendants' motion for summary judgment and ruling that the legal incidence of the tax fell on consumers and not the Community or its members. After additional discovery, the parties again filed motions for summary judgment. The district court again found for the defendants, and granted their motion in its entirety, dismissing the action altogether.

The Community raises six issues on appeal. It argues that 1) the legal incidence of the tobacco tax falls on the Community and its members rather than non-tribal members, in violation of federal law; 2) the Act imposes more than minimal burdens on the Community; 3) an 1842 treaty between the Community's predecessors in interest and the United States prohibits the application of the Act to Community sales; 4) the searches and seizures of tobacco shipments to the Community are unconstitutional usurpations of federal authority to regulate the mails; 5) the searches violated the Community's sovereign immunity; and 6) the search warrants used were invalid under the Fourth Amendment. The first of these six issues was addressed in the district court's first summary judgment order, issued on September 30, 2004, and the other five were addressed in its second summary judgment order, issued on September 12, 2005.

## III.

We review a district court's grant of summary judgment de novo, and must view "the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the non-moving party." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56).

Weighing of the evidence or making credibility determinations are prohibited at summary judgment — rather, all facts must be viewed in the light most favorable to the non-moving party. *Id*.

IV.

### A.  Is the Michigan tax invalid because its incidence falls on the Community, rather than non-member consumers?

"The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes . . ., and in recognition of the sovereignty retained by Indian tribes even after formation of the United States, Indian tribes and individuals generally are exempt from state taxation within their own territory." *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 455 (1995) (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 764 (1985)). For this reason, a state cannot tax products such as cigarettes that are sold on an Indian reservation to tribal members for their own use unless authorized to do so by Congress, but can tax sales made by a tribe to individuals who are not tribal members. *Wagnon*, 126 S. Ct. at 681 ("States are categorically barred from placing the legal incidence of an excise tax '*on a tribe or on tribal members* for sales made *inside Indian country*.'" (emphasis in original, internal citation omitted)). In examining the permissibility of a tax scheme that has some effect on an Indian tribe, "[t]he initial and frequently dispositive question . . . is who bears the legal incidence of [the] tax." *Id*. Although there is no categorical bar on sales by tribes to non-tribal members, such taxation is subject to a balancing test of "federal, state, and tribal interests," and the state may only place "minimal burdens" on the tribe or tribal members "in collecting the toll." *Chickasaw*, 515 U.S. at 458-59.

The statute does not specifically address sales made by Indian tribes. The state has reached comprehensive tax agreements with several other tribes, as discussed in the State Treasurer's letter quoted above, to avoid burdening them with the tobacco tax. Even though the Community does not have an agreement with the state, members of the Community who buy cigarettes do not have to pay the taxes, and Community retailers can get a refund for sales to Community members based on taxes that they prepay but do not collect. The Community's argument is not that the incidence of the tax falls on its members as consumers (which would also be impermissible) but that it falls on the Community retailers in their sales to non-tribal purchasers.

The district court held in its initial summary judgment order that the legal incidence of the tax fell on the non-tribal consumers rather than on the Community. D. Ct. Op., Sept. 30, 2004. It thoroughly examined the TPTA, which established a tax and licensing process for the purchase and sale of tobacco products. The TPTA requires imposition of the tax through precollection, whereby the retailer must initially pay the tax to obtain tobacco products, and the products must bear a stamp to indicate that the tax has been paid. Mich. Comp. Laws §§ 205.426a, 205.422(p). The TPTA declares that its intent is to impose the tax on the consumer, and it contains a "permissive pass-through" provision that states "[a] person liable for the tax may reimburse itself by adding to the price of the tobacco products an amount equal to the tax levied under this act." Mich. Comp. Laws §§ 205.427, 205.427a. The district court rejected the state's argument that this legislative intent was dispositive of the question, reasoning that while a statement of intent could be relevant, it is only dispositive if it is consistent with the operation of the law. It also found the presence of a permissive pass-through provision instead of a mandatory provision not to be determinative. Although mandatory pass-through provisions support a finding that the legal incidence is on the consumer rather than the retailer, the Supreme Court has found legal incidences to be on consumers under statutes without mandatory pass-through provisions. *Calif. Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9 (1985); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980).

The district court also reasoned that pre-collection of tobacco taxes had been approved in several Supreme Court cases as a valid means of collecting the taxes while only imposing a minimal burden on the tribes. D. Ct. Op. at 12. It further found that a bad-debt provision, which allows a party to obtain credit for prepaid taxes that it cannot collect, is evidence that the party does not bear the legal incidence of the tax. *See Chickasaw*, 515 U.S. at 461-62. Although the TPTA as enforced here did not initially contain a bad-debt provision, it was modified in 2003 to include such a provision allowing licensed tobacco sellers to obtain a credit for taxes incurred via bad debts. D. Ct. Op. at 13. In response to the Community's argument that the bad-debt provision did not benefit it because retailers were not licensees under the TPTA, the district court found that retailers mostly sell for cash, which alleviates the need for a bad-debt provision covering retail sales. *Id*. at 14.

The district court also relied on the liability created under the TPTA for sellers and consumers who possess unlicensed cigarettes as a factor supporting its conclusion that the legal incidence of the tax falls on consumers. It further noted a Michigan Court of Appeals decision determining that the incidence of the TPTA fell on consumers. Finally, the State Treasurer had written a letter to all of Michigan's federally recognized tribes, acknowledging the tax exemption for tribes and their members, and informing them that they could file for the tax refund for sales to tribal members. There was also evidence that the Community itself had participated in the refund system. Ultimately, although Michigan's taxation scheme was not identical to schemes that had been upheld by federal courts, the district court found that it imposed the legal incidence on the consumer.

It is worth noting at the outset that the Supreme Court has put great weight on expressions of legislative intent in determining where the legal incidence of a tax falls. *See Wagnon*, 126 S. Ct. at 682 ("Kansas law specifies that 'the incidence of [the motor fuel] tax is imposed on the distributor of the first receipt of the motor fuel.' We have suggested that such 'dispositive language' from the state legislature is determinative of who bears the legal incidence of a state excise tax." (citing *Chickasaw*, 515 U.S. at 461 (describing statements of legislative intent that "expressly identify who bears the tax's legal incidence--distributors, retailers, or consumers" as "dispositive"))). Here, the Michigan statute provides that "[i]t is the intent of this act to impose the tax levied under this act upon the consumer of the tobacco products by requiring the consumer to pay the tax at the specified rate." Mich. Comp. Laws § 205.427a. Because the Community argues that it bears the legal incidence as a retailer and unclassified acquirer (as opposed to its members bearing the incidence as consumers), its argument is largely contravened by Michigan's "dispositive" statement of legislative intent. Thus, to some extent, the district court's examination of the actual effect of the tax goes beyond what the Supreme Court has required in this context.

Even so, if the actual operation of the tax contravenes the expressed legislative purpose, it would make little sense to rely entirely on a statement of legislative intent, and an examination of the operation of the law is thus warranted. *See Coeur D'Alene Tribe v. Hammond*, 384 F.3d 674, 683-84 (9th Cir. 2004) ("If the legislature could indirectly tax Indian nations merely by reciting . . . that the incidence of the tax was on another party, it would wholly undermine the Supreme Court's precedent that taxing Indians is impermissible absent clear *congressional* authorization. . . . [W]hile the legislative declaration is 'dispositive' as to what the legislature intended, removing the need to predict the legislative aim from reports and legislative statements, it cannot be viewed as entirely 'dispositive' of the legal issue that the federal courts are charged with determining as to the incidence of the tax.").

The Community points primarily to two facets of the TPTA as actually placing the legal incidence of the tax on the community: (1) the permissive, rather than mandatory pass-through provision, and (2) the shortcomings of the bad-debt provision. Although a mandatory pass-through provision strongly supports finding that the legal incidence falls on the consumer, the Supreme Court's precedent makes clear that it is not an absolute prerequisite. *See Chemehuevi Indian Tribe*, 474 U.S. at 11 ("None of our cases has suggested that an express statement that the tax is to be passed

on to the ultimate purchaser is necessary before a State may require a tribe to collect cigarette taxes from non-Indian purchasers and remit the amounts of such tax to the State. Nor do our cases suggest that the only test for whether the legal incidence of such a tax falls on purchasers is whether the taxing statute contains an express 'pass on and collect' provision."). The fact that the Community is able to pass the tax through to non-tribal consumers, even if it is not required to do so, is consistent with the legislature's intention and the district court's determination that the legal incidence falls on the consumer. While the Community emphasizes the significance of a mandatory pass-through versus a permissive pass-through, it only cites cases where a mandatory pass-through was found to support the incidence falling on the consumers. It has not identified a case — nor have we discovered one — where a permissive pass-through suggests the incidence lies with the retailer. The critical inquiry addressed by the Supreme Court is whether the retailer is **encouraged** to pass on the cost of the tax to non-tribal consumers — whether or not the pass-through is described by the statutory language as mandatory does not appear to be determinative of the legal incidence.

The application of the bad-debt provision here similarly does not undermine the legislative intent to place the incidence of the tax on the consumer. The Supreme Court has found that an entity's ability to withhold or recover taxes connected with bad debt is a significant factor in the legal incidence analysis. *Chickasaw*, 515 U.S. at 461 ("If the distributor remits taxes it subsequently is unable to collect from the retailer, the distributor may deduct the uncollected amount from its future payments to the Tax Commission."). The bad-debt provision here states that a "licensee may deduct the amount of bad debts from the tax levied." Mich. Comp. Laws § 205.427b. The TPTA provides for licensing of wholesalers and unclassified acquirers, but does not require or provide for licensing of retailers. Mich. Comp. Laws § 205.423. The Community functions alternatively as both a retailer (insofar as it sells tobacco products at retail) and an unclassified acquirer (through its acquisition of tobacco products from its suppliers, as defined by the Act). The district court determined that there is no need for the Community to take on bad debt as a retailer, because retail sales are rarely made on credit, and that to the extent the Community accrues bad debt as an unclassified acquirer (i.e. it sells on credit cigarettes it has imported other than through retail sales), it can in fact write off the bad debt. Stated differently, if the Community pays taxes on cigarettes it acquires and then sells to another entity without collecting payment, it can deduct the tax-related portions of this bad debt from its next tax payment. Although it might not be able to do this in its retail capacity, the Community does not effectively refute the district court's conclusion that as a retailer there is no need to accrue bad debt.[2] The bad-debt provision here is not as straightforward as that in *Chickasaw* given the varying applications to the Community, but its complicated functioning does nothing to undermine the legislature's attempt to make consumers pay the tobacco tax.

Additionally, the several other factors cited by the district court support its conclusion that the legal incidence of the tax falls on non-tribal consumers. Significantly, if consumers (other than tribal members) are found with unstamped and untaxed cigarettes, they are deemed "personally liable for the tax imposed by this act, plus a penalty of 500% of the amount of tax due under this act." Mich. Comp. Laws § 205.428. This provision strongly supports the state's argument that non-tribal consumers bear the legal incidence of the tax. *Cf. Chickasaw*, 515 U.S. at 462 ("Oklahoma's law imposes no liability of any kind on a consumer for purchasing, possessing, or using untaxed fuel; in contrast, the legislation makes it unlawful for distributors or retailers 'to sell or offer for sale in this state, motor fuel or diesel fuel while delinquent in the payment of any excise tax due the state.'").

---

[2]The Community does not appear to make much of the fact that the statute was only recently amended to include a bad-debt provision. If it had been forced to pay taxes on tobacco products for which it should have been reimbursed for upon resale, but lost these assets because of the failure of its buyers to pay their debts, then the Community ought to have brought a damages claim for these losses. Instead the Community only addresses the current application of the bad-debt provision, suggesting that this issue is only relevant to its claims for injunctive or declaratory relief. The fact that this portion of its challenge only goes after the bad-debt provision on its face reinforces the district court's determination that there is little need for retailers to accrue bad debt.

Further, while the statute does not explicitly state how it is to apply to non-taxable sales on Indian reservations to members of Indian tribes, the State Treasurer wrote a letter to the Community in 1999 recognizing the exemption and clarifying the procedures by which it would operate. D. Ct. Op. at 15-16. This letter further supports the state's claim that as enforced, the statute is consistent with the legislature's intention to place the legal incidence of the tax on the consumers and not on the Community.

For these reasons we affirm the district court's conclusion that the legal incidence of the tax falls on non-tribal consumers and not on the Community.

### B. Is the State's requirement that the community "pre-pay" the tax more than a minimal burden under federal tax law?

The Community argues that even if the legal incidence of the state's tobacco tax falls on non-tribal consumers, the tax is still invalid because the collection scheme places more than a minimal burden on the tribe.[3] Specifically, the Community contends that the requirement that it pre-pay the cigarette tax with respect to products to be sold in Indian territory amounts to a tax itself, even if it is eventually refunded. The Community has to wait to be reimbursed until the prepayment amounts are calculated, submitted to the state, and actually refunded. Exacerbating the problem further, the state can withhold payment for up to 45 days without paying interest, essentially creating a tax equal to the amount of interest that would accrue on the refund.[4] Moreover, the state has withheld large portions of the Community's refunds based on its unilateral determination that the Community must have been selling tax-free cigarettes to non-tribal members. The state has also delayed several refund payments beyond 45 days without explanation.

The Community acknowledges that the Supreme Court has approved state requirements that Indian retailers collect state taxes from non-tribal members, remit those proceeds to the state, and maintain records regarding the collection of taxes. *See, e.g., Chemehuevei*, 474 U.S. at 12; *Colville*, 447 U.S. at 159-60. In an attempt to distinguish this case, it focuses on the prepayment requirement, the 45-day time period during which it assumes the tax for sales to tribal members prior to being refunded, and the fact that the state has at times withheld refunds for longer than 45 days without providing any interest or other additional refund to the Community. The state and the Community agree that the Supreme Court has never addressed the question of whether prepayment by a tribe is only a minimal burden. The state contends, however, that this burden is in fact minimal, as it only involves minor administrative fees and a temporary withholding of the refunds to which the Community is entitled. The state also contends that this burden is necessary due to the problems with enforcement it has encountered, and the administrative burdens that would fall upon the state if the taxes were collected after sale. The state introduced evidence that the Community's cost resulting

---

[3] As mentioned briefly in Section A above, a state can place a minimal burden on a tribe in collecting its tax only if the prerequisite balancing test of "federal, state, and tribal interests" favors the state's collection of the tax through the tribe. *Chickasaw*, 515 U.S. at 458-59. The district court conducted this analysis and found that the balance of interests favored the state. D. Ct. Op., 9/12/05, at 11-13. On appeal, the Community does not appear to challenge the conclusion that the state may impose a minimal burden on the tribe in collecting taxes from non-tribal members based on the balancing of interests, but instead argues that the TPTA impermissibly imposes more than a minimal burden.

[4] The exact time when the Community is forced to assume the tax liability varies. In sales to non-tribal purchasers, the Community recoups the tax upon sale of the tobacco product, but still has to assume the tax from the time of its purchase of the products through the time of sale, which averages two weeks according to the state. For sales to tribal members, the 45-day period (and any additional delay on the part of the state) is added to this two-week period.

from the unavailability of the funds amounted to $952 over a two-year period.[5]  Joint App'x at 1074-75.  The Community claimed that this was an underestimate and that the methodology in calculating this amount was fraught with errors, but did not offer a competing estimate.  *See* D. Ct. Op., 9/12/05, at 14.

The district court rejected the Community's argument that the prepayment amounted to more than a minimum burden, given the state's "compelling and unrebutted evidence that its choice of refund system was reasonably necessary to prevent fraudulent sales or tax avoidance."  *Id*. at 17.  It acknowledged that the prepayment amounted to a "temporary tax," but found that the economic and administrative burdens imposed on the tribe were still sufficiently minimal.  The district court also emphasized that Michigan's refund scheme "compares favorably" with the New York's method of taxation approved by the Supreme Court in *Dep't of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73 (1994), in which the state set a quota of cigarettes that the tribe could purchase tax-free.  D. Ct. Op. at 16-17.  Although it expressed concern over both the delays of refunds beyond 45 days and the state's unilateral decision that the Community was not entitled to refunds when the Community's sales to its members exceeded reasonable levels of consumption, the district court upheld the tax method in large part as a valid means of preventing members of the community from evading the collection of the tax, in light of, among other things, evidence that members of the Community were purchasing up to 173 cartons of cigarettes in one month and selling them over the internet.  *Id*. at 14-18.

The Supreme Court has explained the minimal burden inquiry by stating that "States may impose on reservation retailers minimal burdens reasonably tailored to the collection of valid taxes from non-Indians."  *Milhelm Attea*, 512 U.S. at 73.  The state has raised substantiated and valid concerns about enforcement of the cigarette tax as a justification for the pre-collection of the taxes.  Although Michigan has gone further than any taxation scheme that has explicitly been approved by the Supreme Court, any additional burden created by the refund system is minimal.  There is no showing that it leads to a greater administrative burden than the quota system approved in *Milhelm Attea*, and the roughly $1000 dollars lost in interest is a relatively insignificant amount when compared to the $400,000 in refunds received by the Community.  Further, the state offers those tribes that enter into tax agreements with it the option of utilizing a quota system, whereby they can purchase a certain number of tobacco products tax free for sale to tribal members, thereby avoiding the "temporary tax" associated with prepayment.  See Joint App'x at 1019 (Fratzke Aff.).  Of course as a separate sovereign, the Community cannot be required to negotiate a collection agreement, but its consistent refusal to cooperate with the state only serves to make the collection process more burdensome on both parties.

Ultimately, the Community's repeated, brazen, and willful attempts to avoid remittance of the tax so as to profit from illegal sales of tax-free cigarettes to non-tribal members — which have wrongfully deprived the state of legitimate revenue — have forced the state to take a more aggressive approach to the collection of tobacco taxes.  While the refund system could create a greater potential burden than a quota system, the "sole purpose" of the regulation, as in *Milhelm Attea*, is preventing tax evasion.  *Id*. at 75.  Consequently, we are convinced that Michigan's prophylactic refund system is "reasonably tailored to the collection of valid taxes from non-Indians."  *See also id.* ("New York's decision to stanch the illicit flow of tax-free cigarettes early in the distribution stream is a 'reasonably necessary' method of 'preventing fraudulent transactions,' one that 'polices against wholesale evasion of [New York's] own valid taxes without unnecessarily intruding on core tribal interests." (quoting *Confederated Tribes*, 447 U.S. at 160, 162)).

---

[5] The state's expert described this amount as the interest that the Community lost over a two-year period based on its total refunds during that time of $400,000, calculated using the "average annual interest rate on 3-month U.S. Treasury Bills in the secondary market."  Joint App'x at 1074-75.  The Community contests the accuracy of this methodology, but has not submitted a competing estimate.

We do share the district court's concern with the state's unilateral decision to deny certain refunds and their delay beyond 45 days in making others. We are not convinced, however, that these disputes over the state's administration of the TPTA are sufficient to undermine its overall validity. The present action only seeks declaratory and injunctive relief as to the validity of the TPTA, rather than compensation for shortcomings in the refund system. See Amended Compl., ¶¶ 41-65. If these problems continue and the state refuses to adequately compensate the Community, it should be permitted to seek money damages for these losses. On its face, however, we find the refund system to be a permissible means of requiring the Community "aid the State's collection and enforcement" of valid taxes imposed on non-tribal members. *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 483 (1976).

### C. Does the 1842 Treaty between the United States and the Community preempt the state tax?

In 1842, the Chippewa and L'Anse Indians — predecessors in interest to the Community — ceded the western half of the Upper Peninsula and parts of northern Wisconsin to the United States. Article II of the 1842 treaty provides in pertinent part that "the laws of the United States shall be continued in force, in respect to their trade and intercourse with the whites, until otherwise ordered by Congress." The Community contends that the reference to "laws of the United States" placed Indian commerce under the exclusive jurisdiction of federal law and stripped the states of all jurisdiction to tax it. The Community identifies several contemporaneous explanations of the treaty's language, which indicate that it was intended to prevent states from regulating trade in the territory.

The district court dismissed the Community's argument regarding the treaty, stating that "[t]he 1842 Treaty plainly makes federal law applicable to the Ceded Area, and federal law permits the states to impose their tobacco taxes on cigarette[] sales to nonmembers of the Tribe." The Community presents little basis for us to reject this reasoning. Federal law allows states to require tribes to aid in the collection and enforcement of taxes from non-tribal members. *Moe*, 425 U.S. at 483. This is not an area of law where states are altogether pre-empted from acting, as they are clearly permitted to require the assistance of tribes in collecting legitimate taxes from non-tribal members. *See, e.g., Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978) ("Often Congress does not clearly state in its legislation whether it intends to pre-empt state laws; and in such instances, the courts normally sustain local regulation of the same subject matter unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States."). Because we have found that the TPTA properly aids the state in collecting taxes from non-tribal members, it is consistent with federal law and the provisions of the treaty.

### D. Do searches and seizures of tobacco products in the U.S. Mail violate Congress's exclusive authority over the mails?

The Community next claims that the state's search of packages sent to it through the Postal Service and seizure of contraband untaxed tobacco products in those packages violated the exclusive federal authority over the mails, pursuant to Article I, Section 8 of the Constitution ("The Congress shall have Power . . . To establish Post Offices and post Roads.") . The district court found that the state validly seized the contents of the packages as contraband under state law, and reasoned that this did not amount to regulation of the mails. In support of its argument that the search was illegal, the Community points to a Postal Service regulation that prohibits postal workers from opening or inspecting mail without a federal search warrant. *See* 39 C.F.R. § 233.3 (g)(1).

The state points out that none of the state officers named as defendants violated this regulation, as it only prohibits Postal Service employees from allowing searches pursuant to state

warrants.  The Community had originally named certain Postal Service employees as defendants, but dismissed them from the case.

The Community identifies no authority in support of its argument that the Constitution prohibits a state from seizing contraband in the mail.  Although the Postal Service regulation prohibits it, this rule appears to be a matter of internal regulation of the Postal Service.  In order for the Community to enforce this regulation, there must be some private right of action that would allow private enforcement. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.").  The Community has pointed to nothing in section 8 of Article I, the underlying statute, or this regulation that would suggest the intention to confer any individual right, or a private right of action to allow enforcement by individuals, nor do we have reason to believe that one would exist.[6]  Instead the Community simply alleges that the state interference with the mails violates the Supremacy Clause and Congress's authority to regulate the mails.  Compl. ¶64.  Presumably the Postal Service could seek to enforce the regulation against the state authorities, or to refuse to honor state search warrants pursuant to the regulation.  But in light of the Postal Service's apparent acquiescence in the searches in this case, we reject this argument as a basis for the Community to challenge the searches.

### E.  Did the searches and seizures here violate the Community's sovereign immunity?

The Community contends that the state is unable to seize tobacco products that are being shipped to it because it is immune from seizures as an independent sovereign.  The district court rejected this argument based on its reading of two Supreme Court opinions finding such seizures permissible. *Citizen Band*, 498 U.S. at 514 ("Under today's decision, States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation, or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores."); *Confederated Tribes*, 447 U.S. at 161-62 ("Cigarettes in transit . . . are not immune from seizure when the Tribes, as here, have refused to fulfill collection and remittance obligations which the State has validly imposed.").

The Community contends that these decisions are not controlling because the sovereign immunity issue was not raised by the parties.  But whether or not the **litigants** in *Citizen Band* and *Colville* expressly argued that sovereign immunity prevented the seizures, the **Court** was well aware of the issue of tribal sovereign immunity when it approved the seizures in question.  In fact, the *Citizen Band* Court explicitly approved such seizures as an alternative means of state enforcement in response to the state's argument that it was without a remedy due to the Court's holding that the tribe's sovereign immunity protects it from suit by the state.  498 U.S. at 514.  Thus, contrary to the Community's argument, the Supreme Court has clearly endorsed state seizures as a remedy where sovereign immunity prevents in-court remedies.  This underscores the problem with the Community's argument here, as it appears that sovereign immunity only provides immunity from suit, not from seizures.  Although the Community attempts to portray seizures with a search warrant as a type of judicial process, the Supreme Court has clearly taken the opposite view, and the Community's argument on this point is not availing.

### F.  Did the search warrants meet the particularity requirement of the Fourth Amendment?

State officials executed four separate search warrants in conducting the seizures, based on tips from postal workers regarding the shipments of untaxed tobacco products to certain addressees in the

---

[6]Of course the Community has a private right of action to sue for violations of its Constitutional rights under 42 U.S.C. § 1983.  However the use of a state warrant by state police rather than a federal warrant does not, on its own, violate any rights bestowed on the Community by the Constitution or any federal law, including the regulation, rendering enforcement of the regulation a separate matter altogether from enforcement of the Community's federal rights.

Upper Peninsula from certain senders in New York State. The Community did not challenge whether the warrants were based on adequate probable cause, but only whether the language of the warrants satisfied the Fourth Amendment's particularity requirement. It conceded that the first warrant, dated January 10, 2002, was sufficiently particular, but that the two subsequent warrants, from January 14 and 18, 2002, were inadequate.[7] The district court found that although the second and third warrants were not sufficiently particular on their own, they incorporated the accompanying affidavits by reference, and these affidavits met the particularity requirement.

The first search warrant specifically describes the boxes to be seized as well as the addressee and the shipper, whereas the subsequent search warrants are more vague in their description. Joint App'x at 271-72, 280, 289. However the supporting affidavits for the two subsequent search warrants both set forth the identity and experience of the affiant, the source of the information, the belief that a shipment of tobacco products had arrived at the mail processing center, the identities and addresses of the sender and addressee, the affiant's knowledge that the addressee had received illegal cigarettes from the sender before, the fact that none of the referenced entities were licensed tobacco wholesalers or acquirers, and the belief that the shipment violated the state's tobacco tax law. *Id.* at 278-79; 287-88. This mirrors the specifics from the first affidavit with one exception — the first affidavit noted that "[m]arkings on the boxes indicate Seneca regular 100's, a brand of cigarettes." *Id.* at 269-70. The only apparent difference between the first affidavit and the next two is that the shipper and recipient decided in their subsequent mailings to avoid making obvious that the shipments contained cigarettes, presumably because an observer could likely deem the cigarettes to be contraband given the volume being sent via the Postal Service (and the fact that the prior package was seized by the authorities). The failure of the shipper to advertise that a package contains contraband can hardly be said to undermine the validity of a warrant pertaining to the shipment.

Because the particularity of a search warrant can be measured by an accompanying document incorporated by reference, the two subsequent warrants here pass muster under the Fourth Amendment. *Groh v. Ramirez*, 540 U.S. 551, 557-558 (2004). In all relevant respects, the affidavits supporting these two warrants were just as particular as the first, and described the items to be seized with particularity as well as the basis for the probable cause determination. *See id.* Based on the particularity of the accompanying, cross-referenced affidavits, we affirm the district court's finding that the warrants here were sufficiently particular under the Fourth Amendment.

V.

For the foregoing reasons, we affirm the district court's entry of summary judgment on behalf of the state.

---

[7]The Community does not appear to address the fourth warrant either for the sake of comparison or as a separate Fourth Amendment violation.