**Kenya JOHNSON, Plaintiff,**

**v.**

**ITS FINANCIAL LLC, et al., Defendants.**

**Case No. 3:13–cv–192**

United States District Court,
S.D. Ohio,
Western Division,
at Dayton.

Signed July 6, 2015

Jonathan E. Fortman, Law Office of Jonathan E. Fortman, LLC, Florissant, MO, W. Christopher McDonough, The McDonough Law Firm, LLC, Chesterfield, MO, Maureen Connors, Connors and Vaughn, Independence, OH, for Plaintiff.

Todd Evan Bryant, Troy, OH, for Defendants.

**DECISION AND ENTRY: (1) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 83) WITHOUT PREJUDICE TO REFILE; AND (2) DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (DOC. 80)**

Michael J. Newman, United States Magistrate Judge

This civil consent case is before the Court on Defendants' motion to dismiss the second

class action complaint. Doc. 83. Plaintiff Kenya Johnson filed a memorandum in opposition (doc. 85) and Defendants filed a reply (doc. 87). In their briefing before the Court, the parties reference evidence outside the pleadings and acknowledge that Defendants' motion to dismiss should be treated as a motion for summary judgment. *See* doc. 85 at PageID 1426; doc. 87 at PageID 1504. Accordingly, it is so construed. Fed.R.Civ.P. 12(d). Also before the Court is Johnson's amended motion for class certification (doc. 80), Defendants' memorandum in opposition (doc. 84), and Johnson's reply (doc. 86). The Court has carefully considered each of these documents, and the motions are now ripe for decision.

## I. INTRODUCTION

This civil case was originally filed by Plaintiffs Lia K. Smith–Hutchinson, Phyllis Laney, and Chelsea Cochran against thirteen Defendants[1] for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The Court ultimately granted Defendants' motion to dismiss, stayed dismissal for 30 days, granted Plaintiffs leave to file a second amended pleading, and denied Plaintiffs' motion for class certification without prejudice to re-filing. Doc. 29 at PageID 1291–92 n.8.

A second amended complaint was timely filed on October 20, 2014 by new Plaintiff Johnson[2] against Defendants ITS, TCA, Ogbazion, Samborsky, and Wade. Doc. 76 at PageID 1293. Johnson alleges that she hired an ITS franchise in Inglewood, California, n/k/a Plover Financial Services ("Plover"),[3] to prepare her 2009, 2010, and 2011 tax returns. *See* doc. 76 at PageID 1309–15. Plover prepared each of these returns using Johnson's paystubs—as opposed to a W–2 form. *See* doc. 76 at PageID 1309–15. Johnson contends that each year, Plover represented to her that it would retrieve her W–2 form using their computer systems. *Id.* In January 2010, 2011, and 2012, Johnson received a refund from Plover; and, upon receiving her refunds and paying the tax return preparation fee each year, she never questioned either the amount of her return or the fee assessed. *Id.*

In 2011, Johnson allegedly received notice from the Internal Revenue Service ("IRS") that she was being assessed additional taxes in the amount of $1,982 (plus interest and penalties) as a result of underreported income and inflated credits in her 2009 income tax return. *Id.* at PageID 1312. She contends that she paid little attention to the IRS notice and, nothwithstanding the notice, went to Plover and requested preparation of her 2011 tax returns. *Id.* at PageID 1313–14. Subsequently, in 2012, Johnson received additional notices from the state of California and the IRS relating to errors in her 2009 tax returns. *Id.* at PageID 1314–15.

Similar to the original complaint, in the second amended complaint, Johnson alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, against Defendants and seeks to certify a class of:

> All persons residing in the United States of America who paid income tax preparation fees to any Instant Tax Service in the United States of America owned and/or operated and/or franchised by any of the Defendants for preparing and filing a federal income tax return, during the period beginning five (5) years prior to the filing of this action, and who, during that specified period, were notified by the United States Internal Revenue Service that they owe(d) additional tax, penalties, and interest by reason of errors, omissions, or irregularities in their federal income tax return (the "Class").

**1.** The thirteen Defendants are ITS Financial, LLC ("ITS"); TCA Financial, LLC ("TCA"); TCA Capital, LLC ("TCA Capital"); Tax Tree, LLC ("Tax Tree"); Fesum Ogbazion; James B. Mowery; Pete Samborsky; Kyle Wade; Joseph Roda; Brook Wise; Gregory J. Woryk; Bill San Giacomo; and Kevin L. Harwood. Doc. 26 at PageID 509–12.

**2.** The original Plaintiffs—Lia K. Smith–Hutchinson, Phyllis Laney, and Chelsea Cochran—are no longer listed as Plaintiffs and, therefore, are no longer parties to this action. *See* doc. 76 at PageID 1293.

**3.** Plover is not a Defendant in this case. *See* doc. 76 at PageID 1293.

Doc. 76 at PageID 1315–22. In alleging the fraudulent scheme underlying her RICO claim, Johnson—similar to her predecessor Plaintiffs—references a 2012 civil case filed by the United States seeking a permanent injunction against Defendants Ogbazion, ITS, Tax Tree, and TCA for violations of the Internal Revenue Code ("I.R.C.") and other federal and state laws. *See United States v. ITS Fin. LLC*, No. 3:12–cv–95, 2013 WL 5947222, at \*1–109 (S.D.Ohio Nov. 6, 2013).

The alleged fraudulent scheme alleged in this case included, *inter alia*, fraudulently advertising loan products; using a taxpayer's paystub instead of a W–2 form in preparing an income tax return; generating fake W–2 forms; filing income tax returns without customer authorization; reporting fictitious income; fraudulently maximizing tax credits, including the Earned Income Tax Credit ("EITC"); and charging excessive fees. Doc. 76 at PageID 1300–09. Defendants allegedly furthered this fraudulent scheme through the use of interstate wires and/or mail by transmitting "false and fraudulent claims … from various ITS offices throughout the United States to the respective IRS offices," *i.e.*, engaging in mail and wire fraud.[4] *Id.* at PageID 1320–22.

Defendants now move for summary judgment on Johnson's claims. Doc. 83 at PageID 1383–92. Johnson moves to certify a class under Fed.R.Civ.P. 23. The Court will separately address these two pending motions by first analyzing Defendants' motion for summary judgment (doc. 83).

## II.  SUMMARY JUDGMENT

### A.  Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir.2007) (quoting Fed.R.Civ.P. 56(c)). "Weighing of the evidence or making credibility determinations are prohibited at summary judgment—rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Techs., Inc.*, 375 Fed.Appx. 482, 485 (6th Cir.2010) (citation omitted). Instead, the party opposing summary judgment "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." *Id.* (citation omitted). Under Fed.R.Civ.P. 56(c), "[a] party asserting that a fact … is genuinely disputed must support the assertion by … citing to particular parts of materials in the record … or … showing that the material cited do *not* establish the absence … of a genuine dispute[.]" Where "a party fails … to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion." Fed.R.Civ.P. 56(e)(2).

### B.  Facts

In support of their motion for summary judgment, Defendants submit an affidavit from Defendant Ogbazion, founder and chief executive officer of ITS and TCA. *See* doc. 83–1 at PageID 1390–92. According to Ogbazion, TCA was a company that originally owned and operated tax preparation stores in Ohio under the brand name "Instant Tax Service." *Id.* at PageID 1390. In around 2004, TCA formed ITS as a subsidiary to franchise the "Instant Tax Service" brand

---

4. Mail fraud is a criminal offense codified at 18 U.S.C. § 1341. Wire fraud is a criminal offense

codified at 18 U.S.C. § 1343.

name, which by that time was a federally registered trademark. *Id.* In 2006, ITS entered into four (4) franchise agreements with Plover including one agreement giving Plover exclusive rights to operate "Instant Tax Service" branded stores in Inglewood, California. *Id.* at PageID 1385. Plover operated retail tax preparation stores in Inglewood as "Instant Tax Service" branded franchise stores until April 2009. *Id.*

According to Ogbazion, by December 2009, Plover's relationship with ITS deteriorated and Plover began filing its customers' tax returns outside the ITS system, but kept using the "Instant Tax Service" name until late 2012, when it changed its d/b/a to "Refund Gateway Tax Service." *Id.* Following a trial in a suit between Plover and ITS—commenced in 2010 in the California Superior Court, Los Angeles County, Case No. TC024993—the court found that Plover owed ITS royalties for its use of the "Instant Tax Service" name from December 2009 until December 2012, and found that Plover had used its own tax filing system from December 2009 forward. *Id.* From December 2009 forward, there were no other stores in Inglewood, California using the "Instant Tax Service" name, other than the stores operated by Plover. *Id.*

Ogbazion also testifies that, as of December 2009, none of the Defendants in this case had any ownership, control, or access to any of Plover's business, including Plover customers' tax returns, Plover's tax filing procedures, and/or other day-to-day operations. *Id.* at PageID 1392. Ogbazion further states that, as of December 2009, none of the Defendants in this case had any other affiliation with, or connection to, any tax preparation stores in Inglewood using the name "Instant Tax Service"; and, even before that time, the only relationship between Plover and ITS was that of franchisor-franchisee—a relationship in which ITS provided Plover with commercially available tax preparation software, but had no access to any customers' tax returns until after they were filed with the IRS. *Id.* Nevertheless, Obgazion also testifies that, after April 2009, Plover continued to operate under the ITS name through late 2012, and that ITS was subsequently award-ed royalties from Plover for its continued use of the ITS name. *Id.* at PageID 1391.

In opposing Defendants' motion, Johnson points to public records suggesting that Plover continued operating as an ITS franchise through 2012. *See* doc. 85 at PageID 1427–29.

## C. Analysis

Defendants assert that Johnson has identified the wrong defendant in this case because they are not responsible for the actions of Plover, a separate business entity that purportedly, and unilaterally, ceased operating as an ITS franchise before Johnson's purportedly fraudulent tax returns were prepared. Doc. 83 at PageID 1386–88. In essence, Defendants argue that, because they and Plover were distinct entities at the time Plover prepared Johnson's taxes, they cannot be held vicariously liable for Plover's alleged misconduct. *See id.* In support of their contention, Defendants cite *White v. Swift Transp. Corp.*, No. 3:05–cv–303, 2005 WL 3240587, 2005 U.S. Dist LEXIS 45320 (E.D.Tenn. Nov. 30, 2005); *Dunn v. Mc.Donald's Corp.*, No. 3:10–0055, 2010 WL 2696508 (M.D.Tenn. July 7, 2010); and *Freese v. Continental Airlines, Inc.*, No. 1:08–cv–1070, 2009 WL 2232857, 2009 U.S. Dist. LEXIS 63214 (N.D.Ohio July 23, 2009). All of these cases concern negligence claims in which the plaintiffs erroneously sued franchisors for the alleged negligent conduct of the named defendants' franchisees. *See id.*

Here, contrary to the circumstances set forth in *White, Dunn,* and *Freese,* Johnson asserts RICO claims under 18 U.S.C. § 1962(c), alleging that Defendants actively participated in a fraudulent enterprise along with its franchisees by, *inter alia*: encouraging them to file tax returns-based paystubs rather than W–2 forms—a practice that, "inevitably, result[s] in an understatement of income" and "result[s] in the imposition of additional tax liabilities . . . interest and penalties"; instructing them "to postdate documents" to avoid detection of paystub filing; encouraging and instructing franchisees to create fake W–2 forms to place them in files where paystubs were used; and profiting from the encouraged wrongdoing by collect-

ing fees based upon the franchisees' gross revenue. Doc. 76 at PageID 1299–1304; *see also ITS Fin., LLC,* 2013 WL 5947222, at *1 (stating that Defendants "[c]landestinely trained and encouraged ITS franchisees to prepare and file tax returns prematurely with paycheck stubs that omitted and understated income, and inevitably resulted in the submission of false federal tax returns"). Thus, *White, Dunn,* and *Freese*—cases in which the franchisor had no participation in the alleged conduct of its franchisees—offer little guidance in determining the issues presented in this RICO case.

Absent a more specific argument and authoritative case law concerning the claims asserted in this case, the Court **DENIES** Defendants' motion for summary judgment (doc. 83) **WITHOUT PREJUDICE** to refile.

## III. CLASS CERTIFICATION

■ Next, Johnson moves for certification of a class pursuant to Fed.R.Civ.P. 23(a) and (b)(3). Doc. 80 at PageID 1363, 1367–75. In seeking class certification, Johnson bears the burden of proof in demonstrating that class certification is proper. *See Golden v. City of Columbus,* 404 F.3d 950, 965 (6th Cir.2005). To maintain a class action, Johnson is required to demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a); *see also Stout v. J.D. Byrider,* 228 F.3d 709, 717 (6th Cir. 2000). Additionally, Johnson must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3); *Stout,* 228 F.3d at 717. This Court must "conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met before certifying a class." *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1078–79 (6th Cir.1996)

(citing *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

### A. Numerosity

■ Defendants do not specifically dispute the numerosity requirement. "There is no automatic cut-off point at which the number of plaintiffs makes joinder impractical, thereby making a class-action suit the only viable alternative." *Bacon v. Honda of Am. Mfg., Inc.,* 370 F.3d 565, 570 (6th Cir.2004). Numerosity is generally met if the proposed class would include "more than several hundred" plaintiffs. *Id.* (citation omitted). Here, Johnson's allegations—and Defendants' lack of response concerning this element—demonstrates that hundreds, if not thousands, of individuals would be part of the proposed class. Accordingly, the numerosity requirement is satisfied.

### B. Typicality

■ The typicality requirement is one that "limit[s] the class claims to those fairly encompassed by the named plaintiff['s] claims." *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 399 (6th Cir.1998) (citation omitted). Additionally:

Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct[.] A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

*Id.* (citing *In re Am. Med. Sys., Inc.,* 75 F.3d 1069 at 1082 (citation omitted)). Typicality is not met where "[a] named plaintiff who proved his [or her] own claim would not necessarily have proved anybody else's claim." *Id.* In other words, "the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.*

■ Here, the Court finds that Johnson's claims are not typical of those of the proposed class. Although Johnson alleges that

Defendants and their franchisees engaged in an array of fraudulent misconduct—including, *inter alia*, fraudulently advertising loan products; using a taxpayer's paystub instead of a W–2 form in preparing an income tax return; generating fake W–2 forms; filing income tax returns without customer authorization; reporting fictitious income; fraudulently maximizing tax credits; and charging excessive fees, *see* doc. 76 at PageID 1300–09—she makes no specific factual allegation that any of her returns were filed without her authorization, fictitious income was reported on her behalf, or she was charged an excessive fee.[5] *See id.* at PageID 1309–15. Thus, even if Johnson successfully proved that Defendants fraudulently advertised loan products, underreported her income because of paystub filing,[6] and inflated credits on her returns, she "would not necessarily have proved anybody else's claim[,]" *see Sprague*, 133 F.3d at 399—namely, the claims of those proposed class members alleging injury as a result of Defendants filing without their consent, reporting fictitious income on their behalf, or paying excessive fees to Defendants and/or their franchisees.

■ In other words, the wide variation regarding the fraudulent conduct each proposed plaintiff was allegedly exposed to is not—as demonstrated by Johnson's own circumstance—uniform across the entire class, *i.e.*, "[t]he fundamental problem in the plaintiff['s] claim [is] that 'all members of the proposed class were not subject to the same allegedly unlawful [conduct].'" *Cf. Insolia v. Philip Morris Inc.*, 186 F.R.D. 535, 545 (W.D.Wis.1998); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 492 (S.D.Ill.1999); *see also Martin v. JTH Tax, Inc.*, No. 9:10–cv–3016–DCN, 2013 WL 442425, at *7 (D.S.C. Feb. 5, 2013) (finding that "varying factual experiences with" a tax preparation business "negate[d] plaintiff['s] ability to demonstrate not just commonality but also typicality"). Accordingly, the typicality requirement is not met in this case and, therefore, class certification is not appropriate.[7]

## C. Commonality and Predominance

■ In addition to the lack of typicality, the Court also finds that commonality and predominance factors are not met. The commonality prerequisite in "Rule 23(a)(2) requires that for certification there must be

---

5. Johnson alleges a number of times that she never questioned the cost of her tax returns. *See* doc. 76 at PageID 1311–12, 1314. Instead, Johnson simply alleges that "[a]t all times, [she] was not aware of the exorbitant fees she was charged for her tax preparations." *Id.* at PageID 1315. From the Court's perspective, such allegation fails to specifically allege that she was actually charged an excessive fee.

6. For example, with regard to paystub filing, there are no facts shown—or even allegations made—that all tax returns filed by Defendants for their clients were filed in the absence of W–2 forms. In fact, in *ITS Fin. LLC*, the Court noted that a random sampling "of over 1,100 tax returns prepared by ITS franchisees in 5 cities in the 2011 tax filing season" showed that 17% of those filed "contained a falsified Form W–2," *i.e.*, files indicative of paystub filing. *ITS Fin., LLC*, 2013 WL 5947222, at *44. While the Court acknowledges that client files containing authentic W–2 forms may have still been filed using paystubs—there are allegations that clients sometimes brought W–2 forms to Defendants and/or their franchisees after the returns had been submitted using paystubs—it nevertheless appears as though a majority of the class proposed would include individuals whose tax returns were prepared and filed by Defendants and their franchisees based upon actual W–2 forms.

7. Although Defendants also do not specifically dispute the adequacy of Johnson as a class representative or her counsel, the Court's finding regarding typicality impacts its analysis concerning the adequacy of representative parties. "Rule 23(a)(4) allows certification only if 'the representative parties will fairly and adequately protect the interests of the class.'" *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083. Adequacy of representation "is essential to due process, because a final judgment in a class action is binding on all class members." *Id.* (citation omitted). The Sixth Circuit has recognized "two criteria for determining adequacy of representation: '1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Id.* (citation omitted). The Sixth Circuit has also recognized that, "[t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.* With regard to the adequacy of counsel, the Court need not make any determination in this regard because class certification is inappropriate for other reasons.

'questions of law or fact common to the class.'" *In re Am. Med. Sys., Inc.*, 75 F.3d at 1080. As held by the Sixth Circuit, "there need only be one question common to the class" to satisfy the commonality requirement. *Sprague*, 133 F.3d at 397. However, "[i]t is not every common question that will suffice," and, instead, "[w]hat [the Court is] looking for is a common issue the resolution of which will advance the litigation." *Id.* Here, again, Johnson and the putative class members were allegedly victims of an array of fraudulent conduct not common to all class members and, as a result, resolution of any common issue will not significantly advance the litigation. *See Martin*, 2013 WL 442425, at *7.

■ Even if commonality was met—and the class restricted to the conduct that allegedly impacted Johnson, *i.e.*, to those persons allegedly impacted by just false advertising, paystub filing, or inflated tax credits—such common issues would not predominate as required by Rule 23(b)(3), which "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citation omitted). "Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1084. Generally, "where no one set of operative facts establishes liability, no single proximate cause applies to each potential class member and each defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy." *Id.* (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196–97 (6th Cir.1988)).

Here, the imposition of additional taxes, penalties, and interest may have resulted from any number of errors, omissions, or irregularities—including mere negligence, oversight, or even the taxpayer's own fraud—not just paystub filing and/or claiming inflated tax credits. As shown by Johnson's own tax return, in addition to an under-statement of the income that she actually reported, *i.e.*, presumably information from paystubs, she also failed to completely report *all* sources of income, including unemployment compensation. *See* doc. 76–1 at PageID 1325–34. Further, while, "[i]n the aggregate, filing tax returns based on paystubs inevitably results in the understatement of … tax liabilities," *see ITS Fin. LLC*, 2013 WL 5947222, at *28, there is no evidence or allegation that every tax return filed based upon information in paystubs resulted in an understatement of income.

Thus, ascertaining whether putative class members suffered injury and whether such injury was caused—or to what extent it was caused—by Defendants' allegedly fraudulent conduct would require extensive analysis of each putative class members' tax returns. Accordingly, individual issues concerning causation—*i.e.*, whether paystub filing was the "but for" and "proximate cause" of the imposition of additional tax, penalties, and interest for each putative plaintiff—will predominate over the common issues.

■ Individual issues regarding causation also plague putative plaintiffs' claims alleging injury as a result of fraudulent advertising of loan products. *See* doc. 76 at PageID 1301 (alleging that Defendants and their franchisees falsely advertised loan products "in order to fraudulently induce customers"). Put simply, an individual inquiry would be necessary to determine whether Defendants' allegedly false advertising caused injury to each putative class member. *See Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 420 (6th Cir.2013). Because the putative plaintiffs' claims concerning fraudulently advertised loan products—*i.e.*, misrepresentations allegedly made to each putative plaintiff—the issue of causation will likely involve individual questions of reliance on the part of each putative plaintiff. *Id.* (noting that "reliance and proximate cause remain distinct—if frequently overlapping—concepts[,]" because a RICO plaintiff's "reliance is 'often used to prove … the element of causation'"); *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 659, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) (stating that, while reliance is not a neces-

sary element of a RICO claim, it is "often used to prove ... the element of causation" in a civil RICO case). These issues of causation will predominate over any common issues presented and, in fact, courts—including the Sixth Circuit—find class certification improper where issues of individual reliance are present. *See Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 399 (6th Cir.1998). Accordingly, class certification is not appropriate in this instance.

## IV. CONCLUSION

Based on all of the foregoing, the Court: (1) **DENIES** Defendants' motion for summary judgment (doc. 83) **WITHOUT PREJUDICE TO REFILE;** and (2) **DENIES** Plaintiff's motion for class certification (doc. 80).

**IT IS SO ORDERED.**